SOUTHWEST HARDWARE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 44927.    Filed April 26, 1955.

*Harrison Harkins, Esq.,* and *John B. Milliken, Esq.,* for the petitioner.

*Francis B. Campbell, Jr., Esq.,* for the respondent.

80

81

**OPINION.**

HARRON, *Judge:* Petitioner is a corporation organized for profit and it does not claim that it is a tax-exempt corporation under section 101 of the 1939 Code. It contends, however, that it is entitled to exclude from its gross income, the earnings upon business done with its members which were credited each year to the members, and were distributed by means of certificates, the 2 per cent receipts.

The only issue to be decided is whether petitioner received, in each taxable year, the earnings in question under an existing contractual obligation to make refunds of them to its members, and whether the members had a right to the patronage refunds founded in a contract, which right did not depend on some corporate action by the petitioner's officers or directors after receipt of earnings. The issue presents the narrow question, only, whether there was a contract between petitioner and its members giving them the right to receive patronage refunds.

There is no specific statutory provision authorizing exclusion of patronage dividends from gross income, but it is established that where a cooperative is obligated to refund to members the profit realized from business transacted with members, it is proper to exclude such profits from taxable income on the theory that they belong to the members and are not income of the cooperative. *Clover Farm Stores*

*Corporation*, 17 T. C. 1265, 1276, 1277; *Colony Farms Cooperative Dairy, Inc.*, 17 T. C. 688, 692; *United Cooperatives, Inc.*, 4 T. C. 93, 106. This rule applies only if the members' rights to patronage refunds existed at the time the members transacted business with the corporation and were not dependent upon any subsequent corporate action. In *United Cooperatives, Inc.*, 4 T. C. 93, 106, the rule is stated in the following way:

However, this practice of excluding patronage dividends from gross income has been limited to those cases in which the right of patrons to such dividends arises by reason of the corporation charter, or bylaws, *or some other contract*, and does not depend upon some corporate action taken subsequent to its receipt of the money later so distributed, such as the action of the corporation's officers or directors. This limitation recognizes that if the money later distributed to patrons is received by the corporation without a legal obligation existing at the time of its receipt to later distribute it, it must be considered as the gross income of the corporation and, since there is no deduction permitted by statute of the amounts later distributed to patrons, it is taxable as such. * * * [Italics supplied.]

The petitioner concedes that its members derived no rights to patronage refunds from a state statute, cf. *Midland Cooperatives Wholesale*, 44 B. T. A. 824, or from petitioner's articles of incorporation or bylaws, cf. *United Cooperatives, Inc., Colony Farms Cooperative Dairy, Inc., Clover Farms Stores Corporation*, and *Midland Cooperative Wholesale, supra*. Petitioner claims that its members had a contractual right to patronage refunds, and that it was contractually obligated, at the time it sold merchandise to members, to make refunds to members of earnings derived from members' purchases without any subsequent corporate action.

The evidence supports petitioner's contention. Petitioner believed it was legally and contractually obligated, when its members made purchases, to make patronage refunds to its members in proportion to their purchases. In verified statements to and exhibits filed with the California Commissioner of Corporations, the petitioner's officers stated that the petitioner operated without profit to itself, and that membership in the petitioner entitled a member to commissions in direct proportion to the gross profit earned by petitioner on the member's purchases. To the same effect are statements contained in the reports of annual audits of petitioner's books. Petitioner, in fact, has distributed patronage refunds to members at all times. In each of the taxable years, and before, petitioner credited on its books to the members, refunds based on purchases, in amounts which equalled its entire earnings above costs and expenses, and distributed certificates, or 2 per cent receipts, to its members.

The evidence establishes, also, that the stockholder-members understood that petitioner was obligated to make refunds to them of earn-

ings based upon their purchases. One of respondent's witnesses testified as follows:

Q. When you became a stockholder in Southwest Hardware Company, Mr. Fields, was the method of operation of Southwest Hardware Company explained to you by Mr. Izenour?

A. Yes.

Q. What did he tell you about the operation?

A. Well, as I recall, in brief, the stockholders comprised the corporation, meaning, I understood it to be the truth, that if you were not a member, possessing stock, you could not buy from Southwest Hardware.

The purpose of the organization was explained to me as follows: That I was to buy as much of the commodities which I could, merchandise, in my store, from them. The reason being that I would be charged jobber's cost, or, as the case might have been, less.

At the end of the year my purchases and all other member purchases were to be aggregated to a total, figured against the total business. A profit was to be arrived at and we were to receive cash checks,—cash payment for whatever was our percentage.

The evidence establishes that the method for making distribution of patronage refunds to members was definite and clear.

Dealers became members of and made purchases from petitioner in reliance on petitioner's representation to them that petitioner's earnings on their purchases would be distributed in patronage refunds. We are satisfied upon consideration of all of the evidence that there was a binding oral agreement to that effect under which petitioner was contractually obligated to distribute net earnings derived from members' purchases; and that the understanding between petitioner and its members constituted a contract. See, 1 Williston, Contracts, sec. 102, p. 323 (rev. ed. 1936). Such contract did not have to be made in writing. See, *Home Builders Shipping Association*, 8 B. T. A. 903, 906, 908. It follows, therefore, that net profits derived from members' purchases belonged to the members as a matter of right, and that petitioner was required to distribute such net earnings as commissions, or patronage refunds. Such net earnings could not be transferred to surplus for distribution as dividends, or otherwise accumulated. Petitioner was under a contractual obligation to pay patronage refunds and neither its directors, nor officers, nor general manager had the discretion to determine that the refunds would or would not be made. The evidence is not opposed to this conclusion. The policy of petitioner's directors of making cash refunds to all members at the same time was not in derogation of the members' rights to receive the patronage refunds.

In *Clover Farm Stores Corporation*, *supra*, the Commissioner made a similar contention. The taxpayer's articles of incorporation provided that the board of directors could determine what part of "surplus" could be declared as dividends, or for other purposes. Nevertheless,

the taxpayer's patrons were found to have a right to patronage refunds under article VIII of its code of regulations to the extent of the excess of the corporation's gross revenues over its expenses and certain other specified items. We said:

Thus, to the extent that article VIII was applicable, the corporation was charged with a liability with respect to the amount involved, and it therefore never did become a part of surplus. The provisions of article VIII were mandatory and neither petitioner's board of directors nor its officers had any discretion to determine whether a refund would or would not be made, and petitioner's general manager could not, as respondent urges, on brief, have decided, with the approval of the directors, that the entire amount of $48,805.66 set up on petitioner's books at the end of 1948 as a "patronage refund" be retained by petitioner with no distribution to its stockholder-members in cash, stock or otherwise. * * * [p. 1279]

In this proceeding, the petitioner's obligation to distribute net earning derived from members' purchases is no less binding than was the obligation of the taxpayer in *Clover Farm Stores Corporation, supra.* Therefore, the net profits in question here never belonged to petitioner and were not its income. Petitioner distributed the entire net earnings of each taxable year by the issuance of the 2 per cent receipts, or certificates which it was obligated to redeem in cash. The stockholders voted to defer the cash payments and took in lieu thereof the 2 per cent notes which petitioner, clearly, was obligated to redeem in cash. Respondent does not contend that the 2 per cent receipts were not notes of petitioner evidencing a legal obligation to pay the face amounts thereof.

It was never contemplated that earnings would be distributed as dividends. Each member's commissions were calculated on the basis of his purchases during the year. Distributions to members were not made in accordance with ownership of stock. Furthermore, the amounts of members' patronage refunds and the members' right to receive them were not dependent upon any action of petitioner's board of directors. Petitioner's entire earnings were distributed to members in accordance with the agreement which petitioner made with them at the time they became members.

It is true that there is no provision in petitioner's articles of incorporation or bylaws prescribing the payment of patronage refunds to members. But such provision is made in the stockholders' resolution of October 20, 1930, which has never been amended or rescinded, and under the facts present here, that resolution is tantamount to a bylaw provision. Prior to the resolution of October 20, 1930, similar provision was made under another resolution of the stockholder-members.

Respondent does not rest his determination on the fact that the patronage refunds, or members' commissions, were distributed by

means of certificates, i. e., the 2 per cent receipts, or notes; or upon the fact that petitioner's members elected, by vote, to take the notes in lieu of immediate cash refunds. Cf. *Colony Farms Cooperative Dairy, Inc., supra,* p. 689, and pp. 693, 694. What we said there applies here, namely: The funds represented by the 2 per cent notes were retained by petitioner with the consent of its members and represent loans by each of them to petitioner for working capital at a lower rate of interest than petitioner would have had to pay if it had borrowed from a bank. We held in *Colony Farms, supra,* p. 694, that "the distribution in the form of certificates of interest effected a distribution of earnings just as effectively as though made in cash, * * *." We do not find any facts in this case, in the record before us, which require reaching a result different from that reached in the *Colony Farms* case. It is followed here.

Consideration has been given to a few instances where the general manager of petitioner made decisions which amounted to conclusions that a few members had forfeited their rights to patronage refunds. It appears that he believed the members in question had violated their agreements with the petitioner. It may be (a matter we are not called upon to decide) that the general manager acted improperly and outside the scope of his duties. However, the few members so affected had their legal remedies. These instances are *de minimis* and should not and do not affect our conclusions under the issue before us. Petitioner did not retain the "forfeited" commissions; they went into the patronage refunds which were distributed.

Respondent relies on *American Box Shook Export Association,* 4 T. C. 758, affd. 156 F. 2d 629. In that case, the association purchased box shook from its twelve member-stockholders for resale. It was alleged that there was an understanding that the association's receipts, in excess of the cost of the box shook plus a reserve for anticipated claims, would be returned to the members. The evidence did not support the taxpayer's contention that the so-called "understanding" constituted an oral contract. For example, it was not shown that the "understanding" was carried out in practice. During the taxable year, the association retained $13,317.66 of earnings, apparently for its own use, and distributed only $7,559.11 to members. These facts negated the taxpayer's claim that there was an agreement that members were to receive all profits in excess of cost and additions to a reserve. Also, there was evidence that it had been contemplated originally that excess revenue would be distributed by way of dividends on the stock. Although there was an amendment to the bylaws to effect the distribution of excess revenue among the members upon the basis of the dollar value of shipments made by each member, the amendment was never put into effect. Furthermore, the evidence

showed that no amounts were distributable to the members without prior action on the part of the directors, as the members understood. That is to say, it was not mandatory that the association make refunds to members, and the association's directors were not without the discretion of determining whether refunds to members would or would not be made. Cf. *Clover Farm Stores Corporation*, *supra*, p. 1279. Only about one-third of the earnings of the association were distributed to members. *American Box Shook Export Association*, *supra*, is distinguishable on its facts. The evidence in this case is different, and it supports the petitioner's contention that there were oral contracts with its members to make patronage refunds.

It is held that petitioner was under a legal and contractual obligation at the time members made purchases in the taxable years to make refunds of their proportionate shares of gross receipts above costs and operating expenses based upon their respective purchases, and that, accordingly, petitioner is entitled to exclude from its taxable income for each taxable year the amounts of such shares of earnings as were credited to its members and distributed to them by means of the 2 per cent notes called "receipts." Because of this holding, section 275 (c) of the 1939 Code does not apply to the fiscal years ended August 31, 1946 and 1947; deficiencies for those years are barred.

Reviewed by the Court:

*Decision will be entered for the petitioner.*

KERN and WITHEY, *JJ.*, dissent.