UNION EQUITY COOPERATIVE EXCHANGE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 439–70. Filed May 31, 1972.

*Frank Carter*, for the petitioner.
*Thomas J. Miller*, for the respondent.

OPINION

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's income tax of $81,267.77 and $138,164.30 for the taxable years 1961 and 1963, respectively. Petitioner does not contest certain of the adjustments which respondent has made in petitioner's taxable income for the taxable year 1963. The questions we must resolve are: (1) Whether for the taxable year 1963 petitioner may charge dividends on its capital stock solely to net earnings arising from its nonmember business; (2) whether because of his inaction with respect to prior taxable years, respondent is now equitably estopped from attacking petitioner's method of accounting for such dividends; and (3) whether for the taxable year 1964 petitioner is entitled to a net operating loss which would have the effect of reducing its income tax liability for the taxable year 1961.

All of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference.

Petitioner is an Oklahoma cooperative marketing association incorporated and doing business pursuant to the Oklahoma Cooperative Marketing Association Act, Okla. Stat. Ann., tit. 2, sec. 361 *et seq.* (West 1964), and the Capper-Volstead Act, 7 U.S.C. secs. 291–292 (1970). At the time of the filing of the petition herein petitioner's principal office was in Enid, Okla. Petitioner filed Federal income tax returns for its taxable years 1961 and 1963 with the district director of internal revenue in Oklahoma City, Okla.

For all taxable years relevant to this case petitioner's taxable year ended on March 31.

Petitioner was authorized to issue $20 million of capital stock consisting of 40,000 shares having a par value of $500 each and such stock could not be sold for less than its par value. According to its bylaws, any local farmers' cooperative elevator association which was eligible for membership in petitioner and which owned one or more shares of petitioner's capital stock was deemed to be a member of petitioner. Eligibility for membership and for ownership of stock in petitioner were restricted as follows:

Any local farmers' cooperative elevator association organized and operating in conformity with the provisions of the Capper-Volstead Act and located in any territory served by this Association, may become a member of this Association upon written application accepted by the Board of Directors, by agreeing to comply with, and become subject to, all the requirements and provisions of these By-Laws and by purchasing at least one share of its capital stock. Only such local farmers' cooperative elevator associations shall be or remain eligible to hold stock or participate in the affairs and management of this Association.

Petitioner declared and paid dividends on its capital stock as follows;

| Amount | Declared | Paid |
|---|---|---|
| $439, 674. 44 | March 1962 | May 1962 |
| 476, 410. 65 | March 1963 | May 1963 |
| 245, 112. 50 | February 1964 | May 1964 |
| 249, 275. 00 | March 1965 | May 1965 |

From 1950 through its taxable year 1963, petitioner was a non-exempt farmers'· cooperative. On May 8, 1962, petitioner adopted by-laws which were in effect for the taxable year 1963 and which provided in pertinent part as follows:

## ARTICLE VIII

### Apportionment of Earnings

Section 1. The Directors, subject to revision by the members at the regular or special meeting lawfully called, shall apportion the net earnings at least once in each year.

Section 2. The net earnings accrued on business transacted with or for non-members shall be apportioned as follows:

(A) For payment of income taxes on the amount of such net earnings.

(B) The remaining net earnings or any portion thereof may be used to pay dividends on the membership capital or stock at a rate not to exceed five percent (5%) per annum.

(C) The remainder of the net earnings may be transferred to the Surplus Reserve Fund for the purpose of building the Surplus Reserve Fund to meet the requirements of state law and/or liquidate incurred indebtedness or provide needed working capital, or to provide such additional reserves as may be reasonable and necessary; or

(D) The remainder of the net earnings may be apportioned and distributed ratably on the basis of patronage, and in the same media, as provided for in Section 3 of this Article.

Section 3. The net earnings accrued on business transacted with or for members of cooperative organizations who are eligible and approved for membership, shall be apportioned as follows:

(A) If the portion of the net earnings on non-member business which was transferred to the Surplus Reserve Fund, as provided for in Section 2 of this Article, does not equal ten percent (10%) of the total net earnings for the fiscal year, then an amount equal to the difference between the amount so transferred from earnings on non-member business, and ten percent (10%) of the total net earnings for the fiscal year, shall be set aside in the Surplus Reserve Fund until such reserve fund shall equal the amount of the paid-up Capital Stock.

(B) If the net earnings on non-member business is not sufficient to pay dividends on the membership Capital, or Stock, as provided for in Section 2 of this Article, then dividends at a rate not to exceed five percent (5%) per annum may be paid from the net earnings accrued on business done with or for members or cooperative organizations who are eligible and approved for membership.

(C) If the net earnings on non-member business is not sufficient to pay the income tax for the fiscal year by reason of apportionment of member earnings as provided under (A), and/or (B) above, the balance of the income tax shall be paid from the net earnings accrued on business done with or for members or cooperative organizations who are eligible and approved for membership.

(D) The remainder of the total net earnings shall be apportioned and distrib-

uted ratably upon amounts charged for services and upon the value or volume of the products sold to, or handled through, the Association and/or the value or volume of the purchases from, or through, the Association, to all members and cooperative organizations, who are eligible and approved for membership, on the same basis and same percentage. Such earnings shall be distributed either in cash, capital stock, allocated or Special Reserves, provided that amounts prorated to cooperative organizations who are not members but are eligible and have been approved for membership shall be distributed to them in credits on Capital Stock until such accumulated credits are sufficient to cause a share of stock to be issued as provided for in Article I, Section 2, of these By-Laws.

(E) An amount not less than thirty-five percent (35%) of each members [sic] patronage apportioned under this Section shall be credited to the purchase of additional Capital Stock until such member owns fifty (50) fully paid shares.

During a meeting of petitioner's directors on March 18–19, 1963, a motion was made and carried approving the distribution of petitioner's net earnings for the taxable year 1963 as follows:

1. Net Earnings derived from member business be distributed on the basis of patronage—65% shall be payable in Cash and 35% shall be in Capital Stock.

2. Net Earnings from non-member business be transferred to surplus, and

3. 5% Dividend on outstanding stock be paid out of surplus.

For the taxable year 1963 petitioner's total net earnings before adjustments for patronage dividends and dividends on capital stock were $1,519,884.69. In that taxable year petitioner's member business constituted 57.18 percent of the total business it conducted. In calculating the distribution of its net earnings for the taxable year 1963 petitioner first determined that its members had generated $869,070.07 (57.18 percent of $1,519,884.69) of its net earnings. From this sum it made certain reductions and distributed as patronage dividends to its members $559,254.53 in cash and $302,541.30 in capital stock. It paid income tax from the balance of its net earnings and transferred the remaining net earnings to its general or surplus reserve.

From 1950 through the taxable year 1962 petitioner followed its bylaws and charged the dividends it paid on capital stock first to nonmember earnings before computing its patronage dividend deduction. During these years the Internal Revenue Service made periodic audits of petitioner's tax returns, but the examining agents never questioned this accounting practice.

For its taxable year 1964 petitioner was an organization exempt from tax under section 521.[1] On May 14, 1963, petitioner adopted bylaws which were in effect for the taxable year 1964 and which provided in pertinent part as follows:

---

[1] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

## ARTICLE VIII

### Apportionment of Earnings

Section 1. APPORTIONMENT. The directors, subject to revision by the members at the regular or special meeting lawfully called, shall apportion the net earnings at least once in each year.

Section 2. LEGAL RESERVE. Ten percent (10%) of the total net earnings for the fiscal year shall be apportioned and set aside to the general reserve fund unless and until such reserve fund shall equal the amount of the paid-in capital stock.

Section 3. STOCK DIVIDENDS. A dividend not to exceed five percent (5%) may be paid to the stockholders computed on the par value of the capital stock held by each stockholder.

Section 4. PATRONAGE DISTRIBUTION. The remainder of the net earnings shall be apportioned, allocated, and distributed ratably on the basis of patronage to both members and non-members alike (except to the United States Government or any of its agencies), and shall be based upon the value or quantity of the products sold to or handled through this Association. Such earnings shall be distributed either in cash, capital stock, allocated or special reserves; provided, that not less than twenty percent (20%) of the amount of such patronage dividend shall be paid in money, or qualified check; and, provided further, that amounts pro rated to cooperative organizations who are not members but are eligible and have been approved for membership shall be distributed to them in credits on capital stock until such accumulating credits are sufficient to cause a share of stock to be issued as provided for in Article I, Section 2, of these By-Laws.

Section 5. STOCK BUILD-UP REQUIREMENTS. An amount not less than thirty-five percent (35%) of each members patronage apportioned under this Section shall be credited to the purchase of additional capital stock until such member owns fifty (50) fully paid shares.

During the meeting of petitioner's directors on February 23–24, 1964, a motion was made and carried approving the distribution of petitioner's net earnings for the taxable year 1964 as follows:

That 10% of the Net Earnings be transferred to General Reserve;

A stock dividend of 2½% be paid on all outstanding paid up stock; and the remainder of Net Earnings shall be distributed ratably on the basis of patronage to members and non-members—50% in Cash and 50% in Capital Stock.

For the taxable year 1964 petitioner filed an Exempt Cooperative Association Income Tax Return (Form 990–C). On that return petitioner reported total income of $3,132,989.25 and total deductions and adjustments of $3,289,273.46 to arrive at a net operating loss of $156,284.21. Of the deductions and adjustments a total of $906,423.65 constituted deductions or adjustments which petitioner calculated under section 1382 and which it further broke down as follows:

| | |
|---|---:|
| Dividend paid on capital stock | $476,410.65 |
| Patronage dividends: Money | 216,978.86 |
| Patronage dividends: Qualified written notices of allocation | 213,034.14 |
| Total | 906,423.65 |

Petitioner sought to carry back its claimed net operating loss for the taxable year 1964 to the taxable year 1961. As a result it filed an Application for Tentative Carryback Adjustment (Form 1139, rev. June 1961) dated June 12, 1964, in which it applied for a tentative carryback adjustment under section 6411. On that application petitioner computed that its income tax for the taxable year 1961 should have been decreased by $81,267.77 as a consequence of carrying the claimed net operating loss of $156,284.21 for the taxable year 1964 back to the taxable year 1961. In a Notice of Allowance of Tentative Carryback Adjustment (Form 7780–B) dated October 26, 1964, the Internal Revenue Service notified petitioner that it had approved petitioner's Application for Tentative Carryback Adjustment. The Internal Revenue Service allowed petitioner the tentative carryback adjustment of $81,267.77 plus interest to October 26, 1964, of $2,772.

There are three principal issues presented for our consideration.

### 1. *Patronage Dividend Allowable for the Taxable Year 1963*

During the taxable year 1963 petitioner was a nonexempt cooperative marketing association incorporated under the laws of Oklahoma. Petitioner's stockholders were its members and only its members were eligible to hold its stock.

As in effect for that year, the Internal Revenue Code of 1954 had no specific provisions dealing with the taxation of nonexempt cooperative organizations. However, since at least 1918, respondent had consistently ruled that, under proper circumstances, a nonexempt cooperative could deduct or exclude from gross income certain amounts qualifying as refunds or dividends paid on the basis of patronage. T.D. 2737, 20 Treas. Dec. Int. Rev. 441 (1918) ; see also *Puget Sound Plywood, Inc.*, 44 T.C. 305, 318 (1965), and rulings cited therein; cf. T.D. 1996, 16 Treas. Dec. Int. Rev. 100 (1914). The courts have recognized and given sanction to those rulings so that there now exists a relatively large body of case law delineating with some particularity the conditions under which nonexempt cooperatives operating before the effective date of subchapter T [2] might qualify certain distributions as patronage dividends. *Puget Sound Plywood, Inc., supra* at 318–319, and cases cited. For the sake of simplicity and in accord-

---

[2] Subch. T, secs. 1381–1388, which now controls the taxation of both exempt and nonexempt cooperative organizations is effective only for taxable years beginning after Dec. 31, 1962. Sec. 17(c)(1), Revenue Act of 1962, 76 Stat. 960, 1051; *Petaluma Co-Operative Creamery*, 52 T.C. 457, 465, fn. 3 (1969). Petitioner's taxable year 1963 began on Apr. 1, 1962, just 9 months before the effective date of subch. T.

ance with the terminology now employed in subchapter T, we shall speak of such qualified distributions as deductions.[3]

Before analyzing the facts in the instant case it would be helpful to set forth the basic principles under which an allocation of a cooperative's earnings may qualify as a true patronage dividend. As we recently stated in *Petaluma Co-Operative Creamery*, 52 T.C. 457, 465–466 (1969) : [4]

> An allocation of earnings by a cooperative to its patrons will not qualify as a true patronage dividend unless three requirements are met. The first one is that the allocation must be made pursuant to a legal obligation which existed at the time the participating patrons transacted their business with the cooperative. The second requirement is that the allocation must be made out of profits or income realized from transactions with the particular patrons for whose benefit the allocation was made. The third requirement is that the allocation of earnings must be made ratably to the particular patrons whose patronage created the income from which the allocated refund was made. * * *

See also, e.g., *Smith & Wiggins Gin, Inc.* v. *Commissioner*, 341 F. 2d 341, 350 (C.A. 5, 1965), affirming 37 T.C. 861 (1962) ; *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569, 573–574 (C.A. 5, 1964) ; *Farmers Cooperative Co.*, 33 T.C. 266, 268 (1959), reversed on other grounds 288 F. 2d 315 (C.A. 8, 1961) ; *Linnton Plywood Association* v. *United States*, 236 F. Supp. 227, 228 (D. Ore. 1964) ; *Farmers Cooperative Co.* v. *Birmingham*, 86 F. Supp. 201, 230 (N.D. Iowa 1949).

In the taxable year 1963 petitioner had net earnings of $1,519,884.69 of which 57.18 percent (or $869,070.07) had been generated by petitioner's members. After slightly reducing this sum of $869,070.07 for reasons which are not apparent from the record, petitioner distributed to its members as a patronage dividend $861,795.83 in cash and in its

---

[3] See sec. 1382(b). In the Government's earlier rulings patronage dividends seemed to have been treated as deductions from gross income. E.g., I.T. 1499, I–2 C.B. 189 (1922). But the later rulings treated amounts distributed as patronage dividends as exclusions from gross income. See G.C.M. 17895, 1937–1 C.B. 56 ; see also Rev. Rul. 59–107, 1959–1 C.B. 20 ; Rev. Rul. 57–59, 1957–1 C.B. 24 ; Rev. Rul. 54–10, 1954–1 C.B. 24 ; I.T. 3208, 1938–2 C.B. 127. Our use of the term "deduction" should not be interpreted as a determination that patronage dividends should be treated as deductions for other purposes of the Internal Revenue Code. See sec. 1.1382–1(a), Income Tax Regs. We note that at least one court has held that the enactment of subch. T has not changed the character of patronage dividends and that amounts so distributed should be considered to be exclusions from gross income. *Mississippi Valley Portland Cement Co.* v. *United States*, 408 F. 2d 827, 831, fn. 6 (C.A. 5, 1969), certiorari denied 395 U.S. 944 (1969).

[4] The term patronage dividend is now statutorily defined. See sec. 1388(a) quoted at fn. 15 *infra*. It has been stated that with "respect to the definition of a patronage distribution, however, sections 1381 et seq. are merely a codification of prior case law." *Mississippi Valley Portland Cement Co.* v. *United States*, 408 F. 2d 827, 831, fn. 7 (C.A. 5, 1969), certiorari denied 395 U.S. 944 (1969). But see *Certified Grocers of Florida, Inc.* v. *United States*, an unreported case (M.D. Fla. 1966, 18 A.F.T.R. 2d 5012, 66–2 U.S.T.C. par. 9493), comparing the statutory provisions of subch. T with the older judicially evolved law as stated in *Farmers Cooperative Co.* v. *Commissioner*, 288 F. 2d 315 (C.A. 8, 1961), reversing 33 T.C. 266 (1959).

stock. From the remainder of its net earnings petitioner paid income tax and subtracted $476,410.65 which it had declared in the taxable year 1963 as a 5-percent dividend on its capital stock, but which it did not pay until the taxable year 1964. Petitioner transferred what then remained of its net earnings to its general or surplus reserve.

Respondent points out that petitioner's method of computing its patronage dividend has the effect of charging the dividend on capital stock solely to earnings generated by nonmember business. He states that, "By charging capital stock dividends only to income generated by business done with nonmember patrons, rather than ratably against total income, petitioner's net earnings from business done with member patrons is overstated." Respondent would reject petitioner's method of accounting and instead would rely on the accounting method described in A.R.R. 6967, III–1 C.B. 289 (1924),[5] restated and superseded by Rev. Rul. 68–228, 1968–1 C.B. 385.

Under that ruling respondent would first subtract from petitioner's net earnings of $1,519,884.69 the dividend on capital stock actually paid in the taxable year 1963, $439,674.44.[6] The balance remaining

---

[5] In pertinent part A.R.R. 6967 provides as follows :

"First compute the apparent net income of the cooperative association. From this amount deduct the fixed dividend paid or payable on any outstanding capital stock. The amount of such fixed dividend is the portion of net income properly attributable to the investment made in the association by the holders of any outstanding capital stock.

"The balance consists of (1) the amount available for refund to the members of the association and (2) the profits made from nonmembers. In the absence of evidence to the contrary, it will be assumed that the dealings with members and nonmembers are equally profitable, and, accordingly, that the amount available for refund consists of that proportion of the apparent net profits, after deducting the fixed dividend on outstanding capital stock, which the amount of business transacted with members bears to the entire amount of business transacted. Up to the amount available for refund thus computed, a distribution by a cooperative association to its members, upon the basis of the business transacted with them, will be deemed to be a true patronage dividend, deductible by the association in computing its taxable net income for Federal income and profits tax purposes."

[6] In its calculations petitioner has used the figure $476,410.65 which represents the dividend on capital stock declared in the taxable year 1963 but not paid until the taxable year 1964. We note that respondent's use of the figure $439,674.44 (which was the dividend on capital stock actually paid in the taxable year 1963) is more favorable to petitioner in that it results in a larger allowable patronage dividend under the rule of A.R.R. 6967. Consequently we express no opinion on the question of which of the two figures is the proper one for calculating petitioner's allowable patronage dividend. For the same reason we do not deem it necessary to decide whether the apportionment here falls within the rule set forth in *Producers Crop Improvement Association*, 7 T.C. 562, 567 (1946), which held that, under the particular facts there, dividends declared on preferred stock during the taxable year accrued in that same year, become a debt in that year, and hence served to reduce that year's net earnings available for patronage dividends. However, we should point out that in determining the respective amounts satisfying each of the three requirements set out in *Petaluma Co-Operative Creamery, supra* (or in satisfying each of the three basic statutory requirements now listed in sec. 1388(a)), the dividend *declared* in the taxable year may be crucial in determining the amount satisfying one requirement while in satisfying another requirement the dividend actually *paid* in the taxable year may be the proper measure of the amount available.

would consist of (1) the amount available for a patronage dividend to petitioner's members and (2) the profits made from nonmembers. In the absence of evidence to the contrary, respondent would assume that petitioner's dealings with members and nonmembers were equally profitable, and, accordingly, that the amount available for a patronage dividend to members consisted of that proportion (57.18 percent) of the net earnings (after deducting the dividend on capital stock) which the amount of business transacted with members bore to the entire amount of business transacted. Following through with these computations, respondent has disallowed over $200,000 which petitioner had claimed as a patronage dividend.

The accounting method set forth in A.R.R. 6967 has been used in *Producers Crop Improvement Association*, 7 T.C. 562 (1946); *Farmers Union Cooperative Exchange*, 42 B.T.A. 1200 (1940); and *The Trego County Cooperative Association*, 6 B.T.A. 1275 (1927), upon the apparent mutual agreement of the parties therein. In *Valparaiso Grain & Lumber Co.*, 44 B.T.A. 125, 127 (1941), where the taxpayer computed its patronage dividend in the same manner as petitioner here, it was held that the computation rule of A.R.R. 6967 was "fair and reasonable and its use is accordingly sustained." In light of the record in the instant case we must also sustain the use of A.R.R. 6967 as being more than fair and eminently reasonable.

It is true that A.R.R. 6967 is but an administratively formulated rule by which the allowable patronage dividend may be computed. In discussing the applicability of A.R.R. 6967, the Fifth Circuit stated in *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569, 575 (C.A. 5, 1964), that:

As a matter of fact and law, administrative practice has no effect upon the determination of what constitutes gross income, except insofar as the practice is in accord with the rules of law governing that determination.

Therefore, in order to justify the applicability of A.R.R. 6967 in this case, it is necessary to show that its operation reflects and incorporates those principles which underlie the definition of a true patronage dividend.

An amount distributed by petitioner would qualify as a true patronage dividend only to the extent that it satisfied each of the three requirements set out in *Petaluma Co-Operative Creamery* (52 T.C. 457, 465–466 (1969)). In effect this means that if any of the amounts satisfying each of the respective requirements are different from each other, only the smallest such amount may be looked to in arriving at the allowable patronage dividend. We find that at least to the extent that it exceeds respondent's allowed patronage dividend deduction, peti-

tioner's claimed patronage dividend deduction fails to satisfy the requirement that it "be made out of profits or income realized from transactions with the particular patrons for whose benefit the allocation was made." *Petaluma Co-Operative Creamery, supra* at 466.

Petitioner derived net earnings of $1,519,884.69 from transactions between itself and both member patrons and nonmember patrons. In the absence of any proof that nonmember business was more or less profitable than member business respondent's determination that the profits derived from either business was in direct proportion to the amount of such business is indeed reasonable.[7] Petitioner does not reject this aspect of respondent's determination. But it does an immediate turnabout with respect to that practical rule by urging, in effect, that the dividend on capital stock should be charged and attributable only to earnings from nonmember business.

Such attribution ignores the dual nature of the stockholder-patron's interest in its nonexempt cooperative.

On the one hand the stockholder-patron receives a distribution from its cooperative solely in respect of its status as stockholder. This is a normal dividend from net earnings which is not deductible at the cooperative level in the same manner that a distribution of earnings and profits by an ordinary corporation is not deductible at the corporate level.[8] The distributions are based on the stockholder's investment in the cooperative and represent a return on that investment—the greater the investment, the greater the dividend on capital stock.

On the other hand, the stockholder-patron also receives a distribution solely in respect of its status as patron. This latter distribution

---

[7] Without the practical rule of apportionment of member and nonmember profits in accordance with member and nonmember business as set forth in A.R.R. 6967, it would not be inconceivable for respondent to claim that petitioner's profits derived exclusively from nonmember business. Thus, respondent might have determined that none of the amounts which petitioner paid out as a patronage dividend to its members was a true patronage dividend. Since the burden would be on petitioner to show that respondent's determination was erroneous, Rule 32, Tax Court Rules of Practice, petitioner might then be put to the very difficult proof of the respective profitableness of member and nonmember business. It is interesting that at least one taxpayer has used the presumptive rule of A.R.R. 6967 to its favor by showing that one aspect of its nonmember business resulted in no profit at all. *Producers Crop Improvement Association,* 7 T.C. 562 (1946).

[8] It was early recognized that a dividend paid on the capital stock of a nonexempt cooperative was not deductible or excludable and had, in fact, the same character as a dividend paid upon the stock of the usual noncooperative corporation. E.g., *Cloquet Co-operative Society,* 21 B.T.A. 744 (1930) ; *Riverdale Co-operative Creamery Association,* 18 B.T.A. 1159 (1930), aff'd. 48 F. 2d 711 (C.A. 9, 1931) ; *The Trego County Cooperative Association,* 6 B.T.A. 1275 (1927) ; *Farmers Cooperative Association,* 5 B.T.A. 61 (1926) ; *Sacred Heart Cooperative Merchantile Co.,* 2 B.T.A. 24 (1925) ; S.M. 2595, III–2 C.B. 238 (1924), declared obsolete by Rev. Rul. 70–319, 1970–1 C.B. 284. Only an exempt cooperative could then, or can now, claim special deductions for such a dividend and then only to an extent that would not jeopardize its exemption. See, e.g., secs. 521(b)(2) and 1382(c)(1) ; *South Carolina Produce Ass'n* v. *Commissioner,* 50 F. 2d 742 (C.A. 4, 1931), affirming 19 B.T.A. 1028 (1930) ; *Farmers Mutual Cooperative Creamery,* 33 B.T.A. 117 (1935) ; *Laura Farmers Cooperative Elevator Co.* v. *United States,* 273 F. Supp. 1019 (S.D. Ill. 1967).

is based on its patronage with the cooperative during the year—the greater the patronage, the greater the patronage dividend.

In attributing the entire dividend paid on capital stock to non-member business, petitioner is saying, in effect, that its stockholders have invested only in those of petitioner's operations and assets which were used to transact nonmember business. See *Des Moines County Service Co.* v. *United States,* 324 F. Supp. 1216, 1220 (S.D. Iowa 971), aff'd. 448 F. 2d 776 (C.A. 8, 1971) ; cf. *Fertile Co-operative Dairy Ass'n* v. *Huston,* 119 F. 2d 274, 277–278 (C.A. 8, 1941). We are unable to find any indication that the stockholders here invested in anything but the undivided totality of petitioner's operations and assets. By following a computational path that fails to reflect the reality underlying its mode of operation, petitioner has substituted accounting fiction for taxable fact.

Consequently, in the absence of any evidence to the contrary, we uphold respondent's determination that the dividend paid on petitioner's capital stock was properly attributable to net earnings realized from member business and to net earnings realized from nonmember business in proportion to the business transacted with members and nonmembers respectively. Conversely, the amount of member earnings available for distribution as a true patronage dividend would have to be reduced by that part of the dividend on capital stock which was attributable to member earnings.

Petitioner places almost complete reliance on *United States* v. *Mississippi Chemical Co.,* 326 F. 2d 569 (C.A. 5, 1964), affirming 197 F. Supp. 490 (S.D. Miss. 1961). Unfortunately for petitioner that case is distinguishable.

In reaching its decision in that case the District Court found as a fact incorporated into its conclusions of law that no part of the sum paid as patronage dividends was paid from the profits on nonstockholder business. 197 F. Supp. at 492. In affirming the District Court, the Court of Appeals for the Fifth Circuit stated that this finding was "particularly correct." [9] 326 F. 2d at 574. Here, we have not and

---

[9] The District Court also found that—
  plaintiff's charter contains a contractual provision whereby the common stock dividends are to be paid first from profits on non-stockholder business and only the deficiency, if any, may be deducted from the margins on stockholder patronage. [197 F. Supp. at 491.]
The Fifth Circuit placed great emphasis on the view that the charter's provisions prevented the disputed amounts from becoming a part of the cooperative's gross income. In the Fifth Circuit's view, respondent had no legal right, by using A.R.R. 6967, "to transform income of the patrons into income taxable to the cooperative." 326 F. 2d at 574. We remark that under factual circumstances substantially similar to those in *Mississippi Chemical,* the Eighth Circuit has held that under the provisions of subch. T and the regulations thereunder, a cooperative's bylaws will in effect be disregarded for Federal income tax purposes where they conflict with valid statutory and regulatory requirements. *Des Moines County Farm Service Co.* v. *United States,* 448 F. 2d 776 (C.A. 8, 1971), affirming 324 F. Supp. 1216 (S.D. Iowa 1971).

could not make the factual finding which underlay the decision in *Mississippi Chemical*.[10] To the contrary, we have necessarily found that part of the sum which petitioner called a patronage dividend was in fact attributable to profits from nonstockholder business.

## 2. *Equitable Estoppel*

The parties have stipulated that from 1950 through the taxable year 1962 petitioner charged its dividends on capital stock to non-member earnings and that for those years respondent's agents never questioned this accounting practice. On the basis of this stipulation petitioner argues that it has relied on its accounting method for so many years that it would be inequitable to force petitioner to adopt the accounting method which respondent urges in this case.

The short and complete answer to petitioner's plea is that it is well established that the Commissioner is not estopped from challenging erroneously reported items where its agents have failed, in prior taxable years, to challenge similar erroneously reported items. E.g., *Fidelity Commercial Co.*, 55 T.C. 483, 490 (1970), aff'd. (C.A. 4, 1971, 28 A.F.T.R. 2d 5751, 71–2 U.S.T.C. par. 9667); *David O. Rose*, 55 T.C. 28, 32 (1970); *Lozoff* v. *United States*, 266 F. Supp. 966, 971 (E.D. Wis. 1967), aff'd. 392 F. 2d 875 (C.A. 7, 1968). The mere fact that petitioner may have obtained a windfall in prior years does not entitle it to like treatment for the taxable year here in issue, *George R. Tollefsen*, 52 T.C. 671, 681 (1969), aff'd. 431 F. 2d 511 (C.A. 2, 1970), certiorari denied 401 U.S. 908 (1971).

## 3. *Net Operating Loss Allowable for the Taxable Year 1964*

Respondent determined a deficiency in petitioner's income tax for the taxable year 1961 on the ground that it did not sustain a net operating loss in the taxable year 1964, and therefore was not entitled to a net operating loss carryback from the taxable year 1964 to the taxable year 1961.

For the taxable year 1964 petitioner was an "organization exempt from tax under section 521" as contemplated in section 1381(a)(1). However, an "organization exempt from tax under section 521" is not

---

[10] An indication that *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569 (C.A. 5, 1964), must be strictly limited to the particular facts therein may be found in the Fifth Circuit's later recognition that its prior opinion "begins with the assumption that the distributions to shareholders were bona fide patronage dividends." *Mississippi Valley Portland Cement Co.* v. *United States*, 408 F. 2d 827, 835 (C.A. 5, 1969).

necessarily exempt from all income taxes.[11] Section 1381(b) states that "An organization described in subsection (a)(1) shall be subject to the taxes imposed by section 11 or 1201."

The crucial difference between the taxation of a corporation operated on a cooperative basis and the taxation of the usual corporation is that a cooperative must employ the special rules of section 1382 in computing its taxable income for the purposes of section 11 or section 1201. Sec. 1.1381–2(a)(1), Income Tax Regs. There is also a distinction between the treatment of a nonexempt cooperative and the treatment of an organization exempt from tax under section 521(a). While a nonexempt cooperative is entitled only to the extra "deductions" [12] allowed by section 1382(b),[13] an organization exempt from tax under section

---

[11] In the Revenue Act of 1951 Congress changed sec. 101(12) of the 1939 Code so that cooperatives which had been totally exempt from income taxes became subject to the regular corporate income tax at least to the extent of certain earnings placed in reserve and not allocated to patrons. S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 472. The reason for this change was stated in S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951–2 C.B. 473, as follows:

> As a result of this action, all earnings or net margins of cooperatives will be taxable either to the cooperative, its patrons or its stockholders with the exception of amounts which are paid or allocated to patrons on the basis of purchases of personal, rather than business, expense items.

However, in the case of certain paper allocations to patrons, it was later held that such allocations could be deducted or excluded from income at the cooperative level, but would not have to be included in income at the patron level. E.g., *Long Poultry Farms* v. *Commissioner,* 249 F. 2d 726 (C.A. 4, 1957), reversing 27 T.C. 985 (1957); *B. A. Carpenter,* 20 T.C. 603 (1953), affd. 219 F. 2d 635 (C.A. 5, 1955). One of the principal congressional motives for enacting subch. T and its comprehensive scheme for taxation of all cooperatives, whether exempt or nonexempt, was to correct this deficiency left by the Revenue Act of 1951. H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 482–483; S. Rept. No. 1881, 87th Cong.. 2d Sess. (1962), 1962–3 C.B. 817.

[12] Through the years patronage dividends have been variously denominated as deductions or exclusions from gross receipts, gross income, or taxable income. See, e.g., fn. 3 *supra; Co-Operative Oil Ass'n* v. *Commissioner,* 115 F. 2d 666 (C.A. 9, 1940) (questioning allowance of any deduction without specific statutory authorization), affirming a Memorandum Opinion of the Board of Tax Appeals; *Greene County Farmers Sales Ass'n* v. *United States,* 55 F. Supp. 123 (Ct. Cl. 1944) (rebates deductible as cost of doing business); *Southwest Hardware Co.,* 24 T.C. 75, 86 (1955) (exclusions from "taxable income"); *Home Builders Shipping Association,* 8 B.T.A. 903, 909 (1927) ("part of the cost of goods sold in determining the petitioner's gross income"). The Code now requires that a patronage dividend be treated as "an item of gross income and as a deduction therefrom." Sec. 1382(b). In conformity with such description in the Code, we shall refer to an amount paid as a patronage dividend simply as a deduction. See fn. 3 *supra.*

[13] SEC. 1382(b). PATRONAGE DIVIDENDS.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)) * * * with respect to patronage occurring during such taxable year; or

(2) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid as a patronage dividend during the payment period for the taxable year during which the patronage occurred.

For purposes of this title, any amount not taken into account under the preceding sentence shall be treated in the same manner as an item of gross income and as a deduction therefrom.

521(a) is entitled to the additional special deductions of section 1382(c).[14]

In general, the taxable income of an exempt cooperative is that portion of its gross income (less usual deductions) which remains after subtracting, first, "as an item of gross income and as a deduction therefrom" each of the items described in section 1382(b)(1) and section 1382(b)(2) and, second, deductions allowed in "determining the taxable income" as provided in sections 1382(c)(1) and 1382(c)(2). The only deductions that concern us here are those allowed by sections 1382(b)(1) and 1382(c)(1). Thus, petitioner's taxable income is that portion of its gross income (less usual deductions) which remains after reduction for "amounts paid during the payment period for the taxable year as patronage dividends," sec. 1382(b)(1), and "amounts paid during the taxable year as dividends on its capital stock," sec. 1382 (c)(1). As a result, although an exempt cooperative's gross receipts may exceed its operating expenses in a particular year, if the exempt cooperative pays enough of such excess as patronage dividends during the payment period for the taxable year or as dividends on its capital stock during the taxable year, then its gross income (and/or its taxable income) may be reduced to zero.

As was the case for taxable years prior to the effective date of subchapter T, a patronage dividend must satisfy a basic threefold test before it may qualify for deduction.[15] In particular the patronage dividend must be "determined by reference to the net earnings of the

---

[14] SEC. 1382(c). DEDUCTION FOR NONPATRONAGE DISTRIBUTIONS, ETC.—In determining the taxable income of an organization described in section 1381(a)(1), there shall be allowed as a deduction (in addition to other deductions allowable under this chapter)—

    (1) amounts paid during the taxable year as dividends on its capital stock; and,

    (2) amounts paid during the payment period for the taxable year—

        (A) in money, qualified written notices of allocation, or other property (except nonqualified written notices of allocation) on a patronage basis to patrons with respect to its earnings during such taxable year which are derived from business done for the United States or any of its agencies or from sources other than patronage, or

        (B) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid, during the payment period for the taxable year during which the earnings were derived, on a patronage basis to a patron with respect to earnings derived from business or sources described in subparagraph (A).

[15] SEC. 1388. DEFINITIONS; SPECIAL RULES.

    (a) PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

        (1) on the basis of quantity or value of business done with or for such patron,

        (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

        (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

organization from business done with or for its patrons." Sec. 1388 (a)(3).

What is meant by the phrase "by reference to the net earnings"? "Net earnings" itself is a nebulous term. It is not defined in the statute.[16] The phrase "by reference to net earnings" is similarly undefined in the statute.

In any event, section 1.1388–1(a)(1), Income Tax Regs., provides that:

The term "net earnings", for purposes of * * * [the definitional test of sec. 1388(a)(3)], includes the excess of amounts retained (or assessed) by the organization to cover expenses or other items over the amount of such expenses or other items. For purposes of such * * * [sec. 1388(a)(3)], net earnings shall not be reduced by any taxes imposed by subtitle A of the Code, but *shall be reduced by dividends paid on capital stock* or other proprietary capital interests. [Emphasis supplied.]

Thus, without comprehensively defining "net earnings" or "by reference to net earnings," the regulations direct that certain items must be treated in certain ways if a calculation of the allowable patronage dividend is to be made "by reference to net earnings." In this sense, the regulations fill in certain definitional gaps in the same way that section 312 fills in many, but not all, of the definitional gaps created by the use of the term "earnings and profits." See Katcher, "What is Meant by Earnings and Profits," 18th Ann. N.Y.U. Tax Inst. 249 (1960); Andrews, " 'Out of Its Earnings and Profits:' Some Reflections on the Taxation of Dividends," 69 Harv. L. Rev. 1404 (1956).

In its computation petitioner recognizes that net earnings should be reduced by dividends on capital stock before computing the allowable

---

[16] Among other things net earnings have, often interchangeably, also been called profits, *Central Co-operative Oil Association,* 32 B.T.A. 359 (1935); net profits, *Mississippi Valley Portland Cement Co.* v. *United States,* 408 F. 2d 827, 830 (C.A. 5, 1969); savings, *Co-Operative Oil Ass'n* v. *Commissioner,* 115 F. 2d 666, 668 (C.A. 9, 1940), affirming a Memorandum Opinion of the Board of Tax Appeals; net savings, *McLean County Service Co.,* 45 B.T.A. 1004, 1008 (1941); total net income, *Fruit Growers Supply Co.,* 21 B.T.A. 315, 325 (1930), affd. 56 F. 2d 90 (C.A. 9, 1932); apparent net income, A.R.R. 6967, III–1 C.B. 289 (1924); net margin, Caplin, "Taxing the Net Margins of Cooperatives," 58 Geo. L.J. 6 (1969); or net proceeds, *Puget Sound Plywood, Inc.,* 44 T.C. 305, 318 (1965). The Exempt Cooperative Association Income Tax Return (Form 990–C) which petitioner used for its taxable year 1964 was divided into three major sections denominated "Gross Income," "Deductions," and "Tax." On line 11 of that return petitioner listed the sum of its various receipts including gross profit from its cooperative transactions, interest, rent, and a patronage dividend which it received from a bank. On line 27 of that form it listed the total of the usual deductions to which any normal corporation might have been entitled. Line 28, which in effect is "net earnings," is denominated merely "Line 11 less line 27." On the usual corporation income tax return (Form 1120) which petitioner filed as a nonexempt cooperative for the taxable year 1963, lines 11 and 27 coincide with lines 11 and 27 of Form 990–C, but line 28 is entitled "Taxable income before net operating loss deduction and special deductions." Loosely speaking, then, "net earnings" is what remains of a cooperative's gross receipts after deductions for the usual corporate operating expenses. In the instant case this remainder became the source for such items as (1) income taxes, (2) amounts to be added to petitioner's general reserve, (3) dividends on capital stock, and (4) patronage dividends.

patronage dividend deduction. However, petitioner reduces its net earnings by the dividend declared on capital stock in the taxable year 1964, but which was not actually paid until the taxable year 1965. Respondent argues that instead petitioner should reduce net earnings by the dividend actually paid on capital stock in the taxable year 1964.[17] Respondent points out that in computing its taxable income petitioner has deducted the dividend paid on capital stock in the taxable year 1964, while in computing its patronage dividend it has reduced net earnings by the dividend declared on capital stock in the taxable year 1964. Respondent argues that petitioner should use the same dividend-on-capital-stock figures in both computations and urges that the proper figure is the one corresponding to the dividend actually *paid* in the year in issue. We agree with respondent.

The language of the regulations seems to require that in calculating the allowable patronage dividend deduction, net earnings should be reduced by the dividends *paid* on capital stock. Sec. 1.1388-1(a)(1), Income Tax Regs. Petitioner's argument on this issue is unclear. Petitioner has not shown why this regulation is not a reasonable interpretation of the statute. In fact, the conclusory nature of petitioner's argument on this third issue fails to reveal its reliance upon any specific ground which might justify allowance of a net operating loss for the taxable year 1964.

---

[17] In his explanation of adjustments accompanying the notice of deficiency herein, respondent determined that petitioner was entitled to a patronage dividend deduction only to the extent of $206,352.64, as follows:

| | |
|---|---:|
| Net earnings before dividends, per return | $750,139.44 |
| Plus: Charitable deductions disallowed | 8,486.44 |
| Corrected net earnings before dividends | 758,625.88 |
| Less: 10% to general reserve | 75,862.59 |
| Less: Dividend *paid* on capital stock during year | 476,410.65 |
| Amount available for patronage dividend | 206,352.64 |

Petitioner claimed a patronage dividend deduction of $430,013. Respondent disallowed $223,660.36, the difference between the claimed patronage dividend deduction ($430,013) and the allowable patronage dividend deduction ($206,352.64). By adding this disallowed patronage dividend deduction to petitioner's loss as shown on its return, respondent eliminated the entire loss and determined that petitioner had a positive taxable income for the taxable year 1964. We note, however, that sec. 1382(b) describes a patronage dividend deduction as an item of *gross income* and a deduction therefrom. Conversely it would appear that an amount disallowed as a patronage dividend deduction should be added to gross income and not to taxable income. But, whether the disallowed patronage dividend deduction is added to taxable income or to gross income, the end result is the same—a positive taxable income. With no loss to carry back from the taxable year 1964, respondent determined that the previously tentatively allowed carryback adjustment to the taxable year 1961 should not originally have been allowed.

In another part of the explanation respondent had determined that petitioner's taxable income for 1964 (without deduction for charitable contributions) was $79,855.36, and that the charitable deduction would be limited to 5 percent of that figure, or $3,992.77. See sec. 170(b)(2). As petitioner had claimed $12,479.21 as charitable deductions, respondent disallowed $8,486.44, the difference between the amount claimed ($12,479.21) and the amount allowable ($3,992.77). Petitioner does not question respondent's computation of the allowable charitable deduction, nor does it suggest that respondent's *disallowance* of $8,486.44 in charitable deductions should not effect an increase in its net earnings for the taxable year 1964. But see *Jacob M. Kaplan*, 43 T.C. 580, 598-599 (1965).

In a different factual situation this regulation has specifically been upheld by the Eighth Circuit. *Des Moines County Farm Service Co.* v. *United States*, 448 F. 2d 776 (C.A. 8, 1971), affirming per curiam on the basis of 324 F. Supp. 1216 (S.D. Iowa 1971). Respondent's regulation also seems firmly based as applied in the instant case.

Deductions from gross income are allowed for patronage dividends *paid* "with respect to patronage occurring during" the taxable year. Sec. 1382(b)(1). Since the fund from which petitioner could draw a patronage dividend for the taxable year 1964 could not include any amount paid to its members to the extent that such amount was out of earnings other than from member business, section 1388(a), that fund was certainly no greater than the earnings from all sources for the taxable year 1964. But during the taxable year 1964, petitioner *paid* $476,410.65 as a dividend on its capital stock. What effect, if any, did these distributions have on the fund available for payment of a patronage dividend?

If we analogize net earnings to earnings and profits, we would find that the payment by a cooperative of a dividend on its capital stock would tend to decrease the cooperative's net earnings by the amount of such dividend. See sec. 312(a). More importantly, since normal corporate dividends would be considered to be made out of the most recently accumulated earnings and profits, sec. 316(a), the dividend which petitioner paid on its capital stock in the taxable year 1964 would be deemed to have been made out of the net earnings of that same year. Consequently, we would have to reduce the net earnings for the taxable year 1964 by the dividend actually *paid* on capital stock in that year before we could calculate the allowable patronage dividend.

We might reach the same result by using the same analogy but a different route. Thus, as a general rule where an item is common to both taxable income and earnings and profits available for distribution as normal dividends, consistency requires the use of the same accounting method in computing that item's effect upon both taxable income and such earnings and profits. *Sid Luckman*, 56 T.C. 1216, 1223 (1971), and cases cited; see also sec. 1.312–6(a), Income Tax Regs. In the present case, since a dividend on capital stock is an item common to both petitioner's taxable income and its net earnings available for distribution as a patronage dividend, consistency also might require the use of the same accounting method in computing that item's effect upon both taxable income and such net earnings. In determining its taxable income an exempt cooperative is allowed a deduction for amounts *paid* during the taxable year as dividends on its capital stock.

Sec. 1382(c)(1).[18] Therefore, it should also use the figure for the dividend *paid* on capital stock during the taxable year in determining the net earnings available for distribution as a patronage dividend.

Respondent's method and the method of section 1.1388–1(a)(1), Income Tax Regs., seem to implicitly recognize the foregoing principles. While the analogy of net earnings to earnings and profits may not be perfect, we believe such analogy would serve as a reasonable basis for upholding the validity of section 1.1388–1(a)(1), Income Tax Regs., as applied in this case.

But even if we were to accept petitioner's view that in calculating the allowable patronage dividend net earnings should be reduced by the dividend declared on capital stock of the taxable year, we would be unable to allow a greater patronage dividend deduction than respondent has allowed. The reason is that even under petitioner's computation, a large part of the amount claimed by petitioner as a patronage dividend was not an amount paid "under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid." Sec. 1388(a)(2).

Petitioner's bylaws, which for the taxable year 1964 were different from its bylaws for the taxable year 1963, are the only evidence presented of an obligation to pay a patronage dividend. Respondent's regulations recognize that amounts paid pursuant to the provisions of a cooperative's bylaws whereby the cooperative is obligated to make such payment constitute amounts paid under a written legal obligation. Sec. 1.1388–1(a)(1), Income Tax Regs.

Under the relevant bylaws, 10 percent of petitioner's net earnings for its fiscal year "*shall be* apportioned and set aside to the general reserve fund unless and until such reserve fund shall equal the amount of the paid-in capital stock." (Emphasis supplied.) From the 90 percent of net earnings which remained, "A dividend not to exceed five percent (5%) *may be* paid to the stockholders computed on the par value of the capital stock held by each stockholder." (Emphasis supplied.) The remainder of the net earnings after reductions for the legal reserve and for the dividend on capital stock "*shall be* apportioned, allocated, and distributed" as patronage distributions. (Emphasis supplied.) Thus, petitioner was under an obligation imposed by its bylaws to make patronage distributions of the net earnings remaining after reductions for the legal reserve and for the dividend on capital stock.

However, since petitioner's directors had the discretion to declare that so much of petitioner's net earnings as equaled 5 percent of the

[18] Note, however, that amounts paid with respect to certain nonmember earnings described in sec. 1382(c)(2) may be deducted by an exempt cooperative in determining taxable income so long as such amounts are paid within the "payment period" for the taxable year. The "payment period" for the taxable year includes the entire taxable year and extends for some 8½ months beyond the close of such year. Sec. 1382(d).

par value of its capital stock should be distributed to its stockholders as a dividend on capital stock, the obligation imposed by the bylaws extended only to that part of the net earnings which might have remained if the directors had declared a full 5-percent dividend on capital stock. For the taxable year 1964 petitioner's directors declared a dividend on its capital stock of only 2½ percent. Petitioner's computation uses this 2½-percent figure in reducing net earnings for the purpose of ascertaining the fund from which a patronage dividend could be distributed. But, an obligation to pay a patronage dividend is destroyed to the extent that discretion to divert exists. *United States* v. *Mississippi Chemical Co.*, 326 F. 2d 569, 571 (C.A. 5, 1964) ; see also *United Cooperatives, Inc.*, 4 T.C. 93, 107–108 (1944) ; *Southwest Hardware Co.*, 24 T.C. 75, 83 (1955) ; *Clover Farm Stores Corporation*, 17 T.C. 1265, 1279–1289 (1952) ; *Colony Farms Cooperative Dairy, Inc.*, 17 T.C. 688, 693–694 (1951) ; *Fountain City Cooperative Creamery Association*, 9 T.C. 1077, 1080–1081 (1947), affd. 172 F. 2d 666 (C.A. 7, 1949).[19] Thus, even under petitioner's view, only that part of its patronage distributions which exceeded the sum of (1) the amount set aside for the general reserve and (2) an amount equal to 5 percent of the par value of petitioner's capital stock could have been paid "under an obligation of such organization to pay such amount, which obligation existed before the organization received this amount so paid." Sec. 1388(a)(2). In this case that excess is slightly less than the amount respondent has allowed.[20]

[19] While these last-cited cases discuss the excludability or deductibility of patronage dividends of nonexempt cooperatives for years not controlled by subch. T, the term "patronage dividend" as defined in sec. 1388(a) (and particularly with respect to the requirement of sec. 1388(a)(2)) has substantially the same meaning as had evolved under the judicial decisions prior to the enactment of subch. T. Cf. fn. 4 *supra*.

[20] The dividend declared on capital stock in the taxable year 1964 was $245,112.50. Since this sum represents a 2½-percent dividend on capital stock, a 5-percent dividend on capital stock would be twice as large, or $490,225. Petitioner had net earnings of $758,625.88 in the taxable year 1964. By reducing these net earnings by $75,862.59, which represents the 10 percent of net earnings set aside for the general reserve, and $490,225, which represents an amount equal to a 5-percent dividend on capital stock, the net earnings available for a patronage dividend would be $192,538.29, or somewhat less than respondent's allowance of $206,352.64.

On a more fundamental level, we wonder if a patronage dividend "deduction" may even be used in calculating net operating losses. Petitioner had no real operating loss in the taxable year 1964. The excess of its gross receipts over its normal operating expenses was over three-quarters of a million dollars. Sec. 172(c) defines "net operating loss" as "the excess of the deductions allowed by this chapter over the gross income." As already pointed out, fns. 3 and 12 *supra*, a patronage dividend "deduction" differs from the usual type of deduction. Before 1962 there was strong authority supporting the proposition that a patronage dividend "deduction" was in fact an exclusion from gross income and at least one court has continued to adhere to that view even for years to which subch. T applies. *Mississippi Valley Portland Cement Co.* v. *United States*, 408 F. 2d 827, 831, fn. 6 (C.A. 5, 1969). The statute itself seems to recognize the unusual nature of a patronage dividend deduction since it describes it "as an item of gross income and as a deduction therefrom." Sec. 1382(b). But compare sec. 1.1382–1(a), Income Tax Regs., with Asbill, "Final Regs. on Co-ops Offer Some Leeway, But IRS Stands Firm in Certain Areas," 18 J. Taxation 369 (1963). Can an "item of gross income" which is "a deduction therefrom" within the meaning of sec. 1382(b) also be a part of the "excess of the deductions allowed by this chapter over the gross income" within the meaning of sec. 172(c) ? Cf. Rev. Rul. 65–106, 1965–1 C.B. 126. This question is not raised by the parties and, in light of our disposition of this case, we need not answer it.

Petitioner seems to make one further point which we find to be without merit.

On the basis of petitioner's original return for the taxable year 1964 and on the basis of the loss reported by petitioner on that return, respondent allowed petitioner a tentative carryback adjustment of its tax for the taxable year 1961. In its opening brief petitioner's argument seemed to be that respondent is bound by his allowance of that tentative carryback adjustment.

Section 6411(a) provides in pertinent part that:

A taxpayer may file an application for a tentative carryback adjustment of the tax for the prior taxable year affected by a net operating loss carryback provided in section 172(b) * * *

\*       \*       \*       \*       \*       \*       \*

An application under this subsection shall not constitute a claim for credit or refund.

Section 6411(b) goes on to provide that in general, within a statutorily defined 90-day period—

the Secretary or his delegate shall make, to the extent he deems practicable in such period, a limited examination of the application, to discover omissions and errors of computation therein, and shall determine the amount of the decrease in the tax attributable to such carryback upon the basis of the application and the examination * * *

Once the decrease in tax attributable to the carryback is determined, it may be applied or credited in various ways or, as was apparently done in this case, it may be refunded to the taxpayer. Sec. 6411(b).

Petitioner has overlooked the tentative character of adjustments made pursuant to section 6411. If the Commissioner determines that an amount which has been refunded pursuant to section 6411 should not have been so refunded, he may seek to assess such amount as a deficiency in at least two distinct ways. He may assess such amount as a deficiency as if it were due to a mathematical error appearing on the return, sec. 6213(b)(2), or, as appears here, he may proceed by way of a deficiency notice in the usual manner. *John S. Neri*, 54 T.C. 767, 770–771 (1970); *Frank B. Polachek*, 22 T.C. 858, 863–865 (1954); see also *Pearl Zarnow*, 48 T.C. 213, 215 (1967). Consequently, contrary to what petitioner intimates, the Commissioner was not irrevocably bound by his allowance of the tentative carryback adjustment.

In conclusion, petitioner's claim for a net operating loss in the taxable year 1964 must be denied in its entirety.

Reviewed by the Court.

*Decision will be entered for the respondent.*