LAMESA COOPERATIVE GIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 237–79.     Filed June 8, 1982.

---

*Edward R. Smith*, for the petitioner.
*Thomas G. Potts*, for the respondent.

WHITAKER, *Judge*:[*] The Commissioner determined a deficiency in the Federal income tax of petitioner for the taxable year ending July 31, 1974, in the amount of $21,232.11. The issues to be decided are: (1) Whether part of the patronage dividend deduction[1] claimed by petitioner, an exempt cooperative, should be disallowed on the ground that gain from the sale of equipment in taxable year 1974 was not properly allocated among current and former patrons, and (2) whether the patronage dividend deduction should be disallowed to the extent allocable to petitioner's purchasing function.

## FINDINGS OF FACT

The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Petitioner, an agricultural cooperative incorporated under the laws of the State of Texas, had its principal place of business in Lamesa, Tex., when it filed its petition in this case. For all the relevant periods, petitioner has been an exempt farmers' cooperative under section 521.[2]

The primary business of petitioner has been to gin cotton furnished to it by patrons in the general vicinity of Lamesa, Tex., and to market cottonseed, one of the two products resulting from the ginning operation, the other being baled cotton. Most customers sell the cottonseed derived from their cotton to petitioner. Cottonseed was sold to a cooperative regional oil mill of which petitioner was a member patron. Apparently, any farmer who does business with petitioner becomes a member of petitioner.

From 1964 through 1974, petitioner acquired 389 cotton trailers, 7 tractors, and 1 stick machine, which were used by

---

[*]This case was tried before Judge Cynthia H. Hall, who subsequently resigned from the Court. By order of the Chief Judge, this case was reassigned to Judge Meade Whitaker for disposition.

[1]For convenience, we will refer to patronage dividends as deductions. We offer no comment, however, on whether patronage dividends are deductions or exclusions. See sec. 1.1382–1(a), Income Tax Regs.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

its patrons in the harvesting of cotton. According to petitioner's books and records, the 389 trailers were initially acquired at prices ranging from $197 to $754. None of the trailers were identified by serial number or otherwise. Hence, after a trailer was added to the equipment pool, petitioner could not correlate it with any entry on its books, either cost, acquisition or disposition data, or depreciation claimed for tax purposes.

Throughout the period petitioner owned the trailers, tractors, and stick machine, this equipment was subject to depreciation, which was shown by petitioner on its books and records and claimed on its tax returns. The bases of the equipment for purposes of depreciation included the initial purchase prices as well as amounts expended for capital improvements made to some of the trailers.

In the taxable year 1974, petitioner, with the support of a majority of its patrons, decided to dispose of the cotton trailers, tractors, and stick machine. Pursuant to this decision, during the taxable year 1974, petitioner auctioned off all of this equipment then on hand. There were only 285 trailers sold by auction. The discrepancy between the number of trailers initially acquired (389) and the number sold at auction is explained by the fact that during the period 1964 through 1974, many of the trailers were lost, destroyed by fire, or stripped to obtain spare parts. The trailers were sold in 111 lots containing 1 to 10 trailers per lot, at prices ranging from $175 to $1,425. The tractors were sold in two lots for $2,585 and $1,236.50, and the stick machine was sold for $1,000.

Petitioner could not determine the identity of any single cotton trailer. Hence it could not determine the date of purchase, the original cost, the amount of capitalized repairs, or the amount or timing of depreciation deductions taken with respect to each trailer. Thus, it was not possible to determine gain or loss on any one trailer. Petitioner reported the entire $57,622.78 gain from the sale of the 285 cotton trailers as depreciation recapture under section 1245. The gains from the sales of the other equipment were $372.72 for the stick machine, $2,445 for one lot of tractors, and $641 for the other lot of tractors. Because depreciation allowed with respect to each of these assets exceeded the realized gains, these gains were also reported as depreciation recapture under section 1245. Petitioner and respondent have stipulated that the total

$61,081.50 gain from the sale of the equipment was properly reported as section 1245 gain.

Petitioner's bylaws require the annual net savings or margins resulting from the transaction of the business of the association in excess of reserve fund requirements and after the payment of dividends on outstanding capital stock to be allocated among its patrons on a patronage basis. The bylaws also require that accurate patronage records be maintained on a departmental basis to comply with this allocation requirement.

Other than minor purchases of chemicals and supplies for some patrons, which petitioner handled at cost as an accommodation, petitioner's revenues were generated by the charge for ginning of cotton and resales of cottonseed purchased from patrons. Records were kept of the numbers of bales of cotton ginned and the pounds of seed purchased from each patron, and patronage dividends were allocated to each customer based separately on the cotton ginning and seed purchase volume of that patron.

The $61,081.50 gain from the sale of the trailers, tractors, and the stick machine in taxable year 1974 was allocated by petitioner to its current year's patrons in proportion to their patronage that year, and a deduction was claimed by petitioner for the amount so allocated to the patrons.

Petitioner's membership tends to remain stable with little variation from year to year, although the amount of patronage for each member may vary significantly each year. Petitioner has an annual meeting of its membership, usually in August, which is normally attended by 300 to 500 persons. It expends great effort to secure large attendance at this meeting. Past as well as current patrons are encouraged to attend. Most of the 300 persons who attended the annual meeting in 1974 had been members of petitioner in prior years.

At the 1974 annual meeting, as in past years, petitioner's certified public accountant explained the financial report. He discussed the fact that the current year's gain included a substantial sum from the sale of the cotton trailers, but he did not specifically explain that the gain would be allocated only on the basis of patronage in taxable year 1974. This was, however, the customary method for allocating gains received

by petitioner. No patron raised any question as to allocation of the gain from the sale of equipment.

On audit, respondent determined that the allocation of gain from the sale of equipment on the basis of only patronage during taxable year 1974 was improper. Respondent's position is that section 1245 gain on machinery and equipment of a cooperative is patronage sourced but must be allocated to members and nonmembers in the prior years in which the related depreciation deductions with respect to the equipment were claimed. See Rev. Rul. 74–84, 1974–1 C.B. 244.

Petitioner maintains an equity ledger showing the status of each patron's equity or ownership account in each year, but these ledgers were not usually retained by petitioner in complete form. Petitioner also compiled, in at least some of the years during which the equipment was being depreciated, an alphabetized ledger showing patrons' equity account balances, and a separate dividend allocation list was maintained on an annual basis showing each patron's then-current balance of all prior unpaid equities. In 1974, petitioner could have retrieved dividend allocation lists for the taxable years 1967 through 1974.

There is no way to determine simply from the current balances in the equity ledgers or dividend allocation lists precisely how much of a patron's equity is due to patronage in a particular year, although the balances do give a general indication of patrons' cumulative proportions of patronage. The balances do not correlate exactly to past patronage for two primary reasons. First, the amount of gain per unit of patronage varies greatly from year to year. Second, the addition to the equity balance in each year is not the same amount as the total amount of the patronage dividend but is only the retained portion of the patron's patronage dividend for that year. Thus, the equity ledger records only that portion of a patronage dividend not paid to the patron in cash. The percentage of the patronage dividends paid in cash varied between taxable years 1964 through 1974 from 25 percent to 100 percent. Although the gain from the sale of equipment could be allocated back to prior years on the basis of equity ledger balances, the amount so allocated to each year would not precisely correlate to actual patronage in each year because of the wide variations in the amount paid in each year

in cash, and the variations from year to year in the amount of profit and thus in the patronage dividend and resulting equity per unit of patronage.

To arrive at a more accurate computation of how patrons benefited from past depreciation, the annual additions to each patron's equity, which were also shown on the equity ledgers, could be examined. By comparing each patron's increase in equity in a given year to the total increases in equity in that year, each patron's proportionate share of patronage in each year could be computed. The amount of depreciation deductions taken in each year could also be computed, and by correlating these two computations, the extent to which each patron benefited from past years' depreciation on all equipment on petitioner's books for that year could be determined. This would not be an easy computation, however, and if made would not produce an accurate result since it was not possible to relate the gain on any trailer to the depreciation deduction actually claimed in any prior year with respect to that trailer.

During the taxable year 1974, petitioner sold to its patrons, on a voluntary basis, seed, chemicals, and other farm products used in cotton farming. The patrons who purchased supplies from petitioner were generally also patrons of the ginning and cottonseed sales function. Petitioner's purpose in furnishing these agricultural supplies was to accommodate patrons by selling these goods approximately at cost. Petitioner did not account for these sales as a separate purchasing department. Rather, it reported as income all the amounts received from the sale of chemicals, seed, and other farm products, together with the amounts it received from the ginning function of the cooperative and the patronage dividends received from the regional cotton oil mill. From this total amount, petitioner subtracted the various deductions, including its cost of purchasing items sold to members through the purchasing function, to arrive at a net profit or net margin. This net profit was then allocated to the patrons of petitioner's gin on the basis of current patronage, that is, the number of bales of cotton ginned and the pounds of seed purchased.

During the audit, at the request of the revenue agent, petitioner projected a profit on these sales of supplies of $1,868.73. However, this amount was arrived at by simply applying the same rate of profit to expenses associated with

the supplies function as petitioner made on its overall operation. No attempt was made to determine whether this particular purchasing function was actually more or less profitable than the overall operation.

OPINION

Under subchapter T, both exempt and nonexempt cooperatives are subject to tax as corporations. Sec. 1381. Section 1382(a) dictates that the gross income of a cooperative shall not be reduced on account of any allocation or distribution to a patron out of the net earnings of the cooperative except as provided in section 1382(b) for patronage dividends and per-unit retain allocations. Patronage dividends are defined in section 1388(a) as an amount paid to a patron (1) on the basis of quantity or value of business done with or for the patron; (2) under a legal obligation that existed before the organization received the amount so paid; and (3) that is determined by reference to the net earnings of the organization from business done with or for its patrons. The last sentence of section 1388(a) specifies that patronage dividends do not include any amount paid to a patron to the extent that the amount is out of earnings other than from business done with or for patrons, or is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions. This embodies the equitable allocation principle, i.e., that earnings must generally be allocated ratably to the patrons whose patronage created the earnings from which the allocation was made. This principle was recognized as a fundamental characteristic of patronage dividends even before the enactment of subchapter T. *Ford-Iroquois FS, Inc. v. Commissioner*, 74 T.C. 1213, 1218–1219 (1980).

Petitioner and respondent have stipulated that the depreciation recapture caused by the sale of the trailers, tractors, and the stick machine in taxable year 1974 was income derived from patronage[3] and that, under section 1382(f), the taxable

---

[3]In the only case to date to consider this issue, *St. Louis Bank for Cooperatives v. United States*, 224 Ct. Cl. 289, 624 F.2d 1041, 1053–1054 (1980), the Court of Claims in a per curiam opinion held that sec. 1245 gain on the sale of a business asset is patronage-sourced income, noting that the Commissioner takes the same position. See Rev. Rul. 74–84, 1974–1 C.B. 244.

year 1974 is the proper year for the treatment of this gain by the cooperative. The disagreement centers on whether the equitable allocation requirement has been satisfied, respondent contending that such gain must be allocated to patrons in the years in which the recaptured depreciation was claimed.

Clearly, the gain from the sale of the equipment was realized in 1974. It is fundamental to the principle of annual tax accounting that gain is generally reported in the year received or accrued. Furthermore, section 1382(f) requires that a cooperative's earnings should be treated as currently received even though attributable to patronage business of a prior year. Thus, absent a statutory requirement that patronage dividends in some specific circumstances must be allocated to prior years' patrons, one would expect such gain to be includable in current patronage dividend distributions.

On the basis of two principles, viz, operation at cost and equitable allocation, respondent maintains that the gain should have been allocated in proportion to patronage that occurred during the years in which the equipment was being depreciated. On a theoretical basis, respondent's position has some appeal in the sense that if depreciation had not been claimed, dividend distributions in prior years would have been increased. However, minor inequities are often permitted in our tax system. In this case, it cannot be demonstrated that the allocation suggested by respondent would result in a significantly more accurate allocation of patronage dividends than the method used by petitioner. In maintaining that petitioner could have allocated on the basis of equity ledger balances or annual additions to such balances correlated to annual depreciation deductions, respondent ignores the fact

---

We accept the stipulation of the parties to this effect for the purposes of this case only, but no inference should be drawn from that fact, or from the contents of this footnote, as to the position of this Court on the issue, which will await development in a proper case. We note that the third element in the statutory definition of a patronage dividend (sec. 1388(a)(3)) requires that a patronage dividend relate to earnings of the cooperative "from business done with or for" its patrons. Sec. 1.1382–3(c)(2), Income Tax Regs., applies this standard by requiring patronage income to be derived from sources "directly related" to the cooperative's marketing, purchasing, or service activities. At first blush, the nexus between sales of surplus business machinery and "business done with" a patron seems strained. Arguably, any favorable business transaction would to some extent benefit current patrons and might thus be said to constitute "business done * * * for" current patrons. Rev. Rul. 74–84, *supra*, does not discuss this part of the regulations.

that it was impossible to determine how much of the section 1245 recapture income was attributable to depreciation taken in any particular year because neither the original cost nor past basis adjustments of any particular trailer or group of trailers could be determined.

Petitioner argues that even if the gain were attributable to prior years' patronage, it was not inequitable for it to allocate the gain on the basis of the taxable year 1974 patronage, given the substantial similarity of petitioner's membership over the years, the size of the gain relative to earnings over the period in which the equipment had been depreciated, and the practical difficulties involved in allocating the gain in proportion to the benefits patrons derived from the depreciation of the equipment in prior years. We agree with petitioner. Exact equity cannot be accomplished here even if we were endowed with sufficient Solomon-like attributes to be able to divine its parameter. Allocation to current patrons does reasonable equity.

Respondent cites little case law in support of his position but relies largely upon the theoretical basis for the special tax treatment of cooperatives, focusing particularly upon the concept of "operation at cost," which treats the excess of a cooperative's operating revenues over its cost of operations (net margins) as the property of the patrons of the cooperative. Respondent reasons that this concept implies that the net margins are the property only of the particular persons whose patronage caused the excess income and only in direct proportion to their patronage. It appears inferentially that this concept may be the rationale underlying Rev. Rul. 74–84, *supra*. We have heretofore rejected respondent's concept of the "operation at cost" principle. This concept simply means that a cooperative was organized for the purpose of rendering economical services, without gain to itself, to shareholders or to members who own or control it; it is not a codified requirement of tax accounting. *Ford-Iroquois FS, Inc. v. Commissioner, supra* at 1219, 1222; *Associated Milk Producers v. Commissioner*, 68 T.C. 729, 740 (1977). It does not require that the net margins be allocated precisely in proportion to the patronage that generated them.

Respondent also argues the "equitable allocation" principle, citing a number of cases, including four decisions of this Court,

*Union Equity Cooperative Exchange v. Commissioner*, 58 T.C. 397 (1972), affd. 481 F.2d 812 (10th Cir. 1973), cert. denied 414 U.S. 1028 (1973); *Petaluma Co-operative Creamery v. Commissioner*, 52 T.C. 457, 466 (1969); *Farmers Cooperative Co. v. Commissioner*, 33 T.C. 266 (1959), revd. on other grounds 288 F.2d 315 (8th Cir. 1961); and *Pomeroy Cooperative Grain Co. v. Commissioner*, 31 T.C. 674 (1958), affd. in part and revd. in part 288 F.2d 326 (8th Cir. 1961). He contends that the basic requirement that earnings be allocated ratably to the patrons responsible for them was not satisfied in this case, on the assumption that the section 1245 income was earned at the time the depreciation deductions were claimed. We believe, however, that, like the concept of "operation at cost," the requirement of "equitable allocation" should not be seen as a strict accounting requirement but as only a general principle to prevent inequitable treatment to some patrons at the expense of others. As a principle of equity, the overall scheme of allocation should be examined, including the practicalities of making allocations, the democratic nature of cooperatives, and the extent of patronage to the cooperative by nonmembers who have no say over how patronage dividends are distributed.

The cases that have found violations of the "equitable allocation" requirement have generally dealt with cooperatives that have allocated to members some or all of the net margins attributable to nonmembers' patronage. *E.g., Petaluma Co-operative Creamery v. Commissioner, supra; Farmers Union Cooperative Co. v. Commissioner*, 90 F.2d 488 (8th Cir. 1937), affg. 33 B.T.A. 225 (1935). Similarly, the only example of inequitable allocation mentioned in the regulations deals with allocations between members and nonmembers.[4] When one focuses on the nature of a cooperative as an organization run by a management democratically elected by the members,[5] the

---

[4]Sec. 1.1388–1(a)(2)(ii), Income Tax Regs., sets forth the following example, which is identical to that contained in the legislative history (H. Rept. 1447, 87th Cong., 2d Sess. A133 (1962); S. Rept. 1881, 87th Cong., 2d Sess. 317 (1962)):

"if a cooperative organization does not pay any patronage dividends to nonmembers, any portion of the amounts paid to members which is out of net earnings from patronage with nonmembers, and which would have been paid to the nonmembers if all patrons were treated alike, is not a patronage dividend."

[5]See generally I. Packel, The Organization and Operation of Cooperatives, sec. 24, at 106–109 (4th ed. 1970), for a discussion of the basic principle that a cooperative must be

paucity of cases involving allocations other than those between members and nonmembers is explained. The greatest risk of inequitable allocation, and the most pressing need for oversight, concerning a cooperative's allocation of net margins arises when the cooperative allocates net margins between member and nonmember patrons. Because the management of the cooperative is elected by members only, nonmember patrons have no way of preventing allocations that are disproportionate as to them.[6] In contrast, the members of the cooperative directly elect the management and it should generally be presumed the management is acting on their behalf in making allocations. From a conceptual viewpoint, if the cooperative accumulates reserves or allocates net margins to members at the expense of nonmembers, it is not rebating or refunding to its members the excess receipts attributable to commodities they produced and that were sold through the cooperative; rather, the cooperative is allocating to members profits from business transacted with and for nonmembers.

In *Associated Milk Producers v. Commissioner, supra,* we held that net operating losses could be carried forward to future years and charged against future income. We specifically recognized that the carrying over of losses could affect the allocation of the losses among the cooperative's past and future member-patrons because the loss carryover would reduce income and patronage dividend allocations in later years so that the patrons of such later years, many of whom were not patrons during the loss years, would effectively bear the losses. We stressed that the allocation had been performed by the cooperative's board of directors in accordance with the bylaws, and we rejected respondent's reliance on the operation at cost concept. 68 T.C. at 739.

In *Farm Service Cooperative v. Commissioner,* 70 T.C. 145 (1978), revd. 619 F.2d 718 (8th Cir. 1980), we followed *Associated Milk Producers* and refused to find an inequitable

democratically controlled by its members. Under Texas law, each member of a cooperative has one vote regardless of the amount of patronage or stock held. Tex. Agric. Code Ann. secs. 51.013 and 52.085 (Vernon 1982).

[6]Although members have indirect, as well as direct, means of control over the cooperative's management, e.g., the rights to inspect books and records and to bring representative suits, these indirect means of control are not available to nonmember patrons. See I. Packel, *supra* sec. 29, at 121–124.

apportionment of losses when the cooperative had allocated losses from one department against taxable gain from another department in the same year. Although the Eighth Circuit found the particular allocation to be inequitable, its opinion does not help respondent with respect to the question of how the gain from the sale of the equipment in this case should have been allocated. The Court of Appeals stressed that the vertical (i.e., chronological) allocation problem presented in *Associated Milk Producers* was quite distinct from the horizontal allocation problem caused by Farm Service Cooperative's allocation of losses from patronage activities to its nonpatronage, hence taxable, activities. Insofar as the recapture income in this case is concerned, we have a vertical allocation problem.

*Ford-Iroquois FS, Inc. v. Commissioner, supra*, involved a cooperative with a net operating loss carryover. Relying on the same type of theoretical arguments he advanced in this case, respondent argued that the net operating loss carryover should be allocated only to offset income in other years of the same patrons whose business had produced the loss and that allocable portions of the loss would have to be recovered currently from members who terminated their business. On the basis of our reasoning in *Farm Service Cooperative* and *Associated Milk Producers*, we disagreed with respondent's reasoning. We said that "The allocation of losses among a cooperative's past, continuing, and future members is properly the concern of the membership and its board of directors." 74 T.C. at 1222.

In this case, the key factor is that the identity of the patrons has remained stable enough so that there is no reason to assume that petitioner's management would be prone to take actions discriminatory against past patrons. The basic controversy here concerns petitioner's allocation of the earnings among its members; nonmember patrons have not been subjected to discriminatory treatment.

A primary factor influencing petitioner's decision to allocate the gain only to the taxable year 1974 patrons was that it had no records from which it could have determined what the patronage in the past years had been and how such patronage related to depreciation claimed in such years. Much of the testimony in this trial concerned respondent's contention that

an allocation to past years based on balances on the equity ledgers could have been made. However, the equity ledger balances do not in themselves identify a particular patron's patronage in any prior year and they do not relate the amount of past patronage to depreciation deductions taken by the cooperative. Furthermore, respondent admits that use of the equity ledger balances would not have led to a mathematically precise allocation; he only contends that it would have more closely allocated the gain to the particular patrons who got the benefit of the depreciation than petitioner's method, which did not even look at past patronage. As we have pointed out, a mathematically precise allocation could not have been made. We are not convinced that respondent's suggested method of allocation is more equitable than petitioner's or even that petitioner's method is materially inequitable. One of the factors that must be taken into consideration is the practicality of making a particular type of allocation.

Moreover, the trailers were acquired and utilized over a period of 10 years. Petitioner's abbreviated recordkeeping in this regard is not unreasonable, as respondent recognizes. Even if each dollar of this gain could have been related to a particular dollar of depreciation, it is likely that petitioner could not have located all of the patrons over the 10-year span and the cost of the exercise seems disproportionate to the benefit.[7]

Boards of directors of cooperatives do not have carte blanche to make whatever allocations they choose, but we believe respondent should recognize that directors have some discretion, some flexibility, in the exercise of business judgment. Only when unreasonable exercise of that discretion appears should the board's weighing of the equities be overturned by this Court.

---

[7]We are not unmindful of *Burnet v. Houston*, 283 U.S. 223 (1931), and the general principle that petitioners cannot be excused from satisfying their burden of proof simply because accurate records are unavailable. However, the absence of records precisely correlating each patron's share of prior years' patronage to depreciation deductions claimed in each year is not material here. We have found that under all the circumstances, petitioner acted within its discretion when it based the allocations on current patronage only. As we have explained, the equitable allocation requirement does not require net margins to be allocated precisely in proportion to the patronage that generated them; all that is required is that the allocation not unduly benefit some patrons at the expense of others, particularly nonmember patrons.

The second issue in this case concerns respondent's disallowance of an additional $1,868.73 of the patronage dividend deduction claimed by petitioner in taxable year 1974. Respondent maintains that this $1,868.73 was the net margin of a separate supplies-purchasing function of the petitioner and that it was inequitable for petitioner to have allocated this net margin to all the patrons of its marketing function. Petitioner contends, first, that it has no such separate purchasing function, and that even if it were seen as having a separate purchasing function, the distribution should not be considered inequitable. We agree, largely for the reasons discussed in the prior portion of this opinion.

On its books and records and on its return for taxable year 1974, petitioner did not segregate its activities into two separate departments. It made no separate profit or loss allocations to its activities in purchasing supplies but simply included the income and expenses in computing its gross profit and determining the amount to allocate as patronage dividends among all its taxable year 1974 patrons.

Respondent contends that section 521 and section 1.521–1(c), Income Tax Regs., require that a cooperative engaged in both a marketing function and a purchasing function account separately for the amounts derived from each function because the law requires it to operate at cost with respect to each function. See Rev. Rul. 67–223, 1967–2 C.B. 214, for a general statement of respondent's position. However, nothing in section 1.521–1(c), Income Tax Regs., explicitly refers to any separate accounting requirement for cooperatives engaged in both purchasing and marketing; all that is required is that the Code requirements, including equitable allocation, be satisfied with respect to each function. We have previously discussed why we believe the "operation at cost" and "equitable allocation" concepts do not mandate particular forms of accounting.

Although it is obviously easier to determine if the "equitable allocation" requirement is satisfied with respect to both the marketing and purchasing functions when separate accounts are maintained, we do not believe the failure to account separately should automatically cause a patronage dividend deduction to be disallowed. In the cases discussed below, courts have not required separate accounting by each of the different functions of a cooperative. Although none of these cases

involved the regulation cited by respondent here (sec. 1.521–1(c), Income Tax Regs.), we believe they are instructive because they recognize the discretion of the cooperative's board of directors and the importance of factors such as the overlap of the patronage of the different functions and the practicality of separately accounting for each function.

In *Ford-Iroquois FS, Inc. v. Commissioner, supra,* and *Farm Service Cooperative v. Commissioner, supra,* this Court specifically approved of the use of losses from one department to offset gains from another department of a cooperative. In both these cases we recognized the discretion of the cooperatives' boards of directors concerning how to make allocations. Additionally, in *Ford-Iroquois FS,* we focused on the similarity in the identity of the patrons of the two departments, which guarded against the possibility that the board of directors might unjustly favor the patrons of one department at the expense of the patrons of the other department.

In *Juniata Farmers Cooperative Association v. Commissioner,* 43 T.C. 836 (1965), we refused to find an inequitable allocation when an exempt cooperative, which had two purchasing departments and a marketing department, allocated its nonpatronage income on the basis of only marketing patronage. We emphasized that substantially all the patrons of the marketing department were also patrons of the two purchasing departments and that all the patrons were fully cognizant of the method of allocation and deemed it acceptable to them. We stated that the regulation dealing with the deduction allowed to exempt cooperatives distributing nonpatronage income (sec. 1.522–2(d), Income Tax Regs.) wisely adopted a practical approach.

Furthermore, in *Pomeroy Cooperative Grain Co. v. Commissioner,* 288 F.2d at 331–333, the Eighth Circuit refused to require a cooperative to account separately for gains derived from its storage and marketing functions, even though the patronage of these two functions differed somewhat. The Court of Appeals found some merit in the cooperative's argument that it would be impractical to distribute storage profits on the basis of a member's particular storage business because it would require an expensive and complicated method of accounting to do so. Because the storage and marketing functions were integrated and because there was no statute or regulation setting up reasonable standards for the allocation

of profits, the court found that it was not inequitable to allocate both the storage and marketing profits on the basis of the quantity of grain delivered for marketing. In so holding, the court remarked that "the Commissioner should be more concerned with the total exclusions allowable on membership business profits rather than the means by which such profits are divided among the qualified members." 288 F.2d at 333.

*Farm Service Cooperative* was reversed by the Eighth Circuit on appeal because that court did not agree that it was acceptable for the losses of the cooperative's broiler pool function to offset gain the cooperative realized from taxable activities of another function. Respondent maintains that we should follow the Eighth Circuit's approach in the *Farm Service Cooperative* case and that we should require separate accounting for the purchasing and marketing functions. We believe, however, the Eighth Circuit's *Farm Service Cooperative* opinion is inapplicable here. The Court of Appeals was careful to define the issue before it relatively narrowly. Although it did refer to the distinction between horizontal and vertical allocations, it stated that the particular problem before it was that the taxpayer was seeking to avoid taxation on income for which no patronage dividend deduction was available by offsetting such income with losses from patronage operations. Here, in sharp contrast, both the purchasing and marketing functions are patronage sourced.

In determining whether respondent erred by disallowing the patronage dividend deduction that it attributed to gains from the purchasing function, our inquiry should simply be whether the allocation was inequitable in view of the board of directors considerable discretion. Several factors lead us to conclude that the allocation here was not inequitable. First of all, we have no evidence that the patrons of the purchasing function were significantly different from the patrons of the marketing function or that any patron ever objected to the method of allocation. The small size of this supplies-purchasing function relative to the marketing function and the minimal amount of gain attributed to the purchasing and resale of supplies by respondent ($1,868.73)[8] also support the board of directors

---

[8]The $1,868.73 gain allocated to the purchasing function was computed by petitioner's accountant upon being requested during the audit to come up with some profit figure separately allocable to the purchasing function. Respondent argued that since petitioner's own agent came up with this $1,868.73 figure, then it must be assumed that petitioner

decision not to require separate records for the purchasing function. Indeed, to have maintained accounting records with respect to the separate functions may well have cost petitioner almost as much as it is charged with having derived gain from the purchasing function.[9]

In summary, we find that the patronage dividend allocations made by petitioner with respect to both the gain from the sale of the equipment in taxable year 1974 and with respect to any gain that it might have derived from its supplies purchasing function were not inequitable. This is not to say that the particular method of allocation employed by petitioner would have been the only proper way of allocating these gains. We hold merely that petitioner's board of directors did not unjustly discriminate against one group of patrons at the expense of another group, given the practicalities of the allocation, the substantial similarity in the identity of patrons over the years, the absence of any indication that any of the patrons complained about such allocations, and, with respect to the profit from the purchase and resale of supplies, the de minimis nature of the item.

*Decision will be entered for the petitioner.*

---

admits that this amount of gain is clearly allocable to only the purchasing function. We do not agree with this contention. The amount allocated to the purchasing function was an arbitrary amount based not upon the gain derived from the purchasing function itself but computed simply on the basis of the overall gain from all petitioner's operations.

[9]Cf. *Producers Gin, Inc. v. Commissioner,* T.C. Memo. 1959–106, in which we recognized that a cooperative did not have to keep complicated records of patronage if the distributions might vary over the years by only a de minimis amount from those that would have been made had exact records been kept.