KINGFISHER COOPERATIVE ELEVATOR ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5569–83.     Filed April 2, 1985.

---

*Arthur E. Bryan, Jr., James L. Malone III, Don E. Graham,* and *Gary C. Karch,* for the petitioner.

*Charles N. Woodwàrd, Mary E. Speirer,* and *Gary L. Bloom,* for the respondent.

COHEN, *Judge*: Respondent determined a deficiency of $59,724.97 in petitioner's Federal income tax for the taxable year ended March 31, 1981, based on disallowance of part of the patronage dividend deduction[1] claimed by petitioner, a farmers' cooperative subject to the provisions of subchapter T (secs. 1381 through 1388).[2] The issue to be decided is the equitability of petitioner's allocation to its members of patronage dividends received from regional cooperatives according to its members' patronage in the year of receipt. Because "equitability" is the principle to be applied, our findings necessarily contain substantial detail. The facts, however, are essentially undisputed.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner, a local marketing and supply cooperative association organized and incorporated under the Oklahoma Cooperative Marketing Association Act, had its principal place of business in Kingfisher, Oklahoma, at the time it filed its petition herein. Petitioner filed a Federal corporate income tax return on an accrual basis as a nonexempt cooperative for its fiscal year ended March 31, 1981.[3]

---

[1] Patronage dividends are referred to herein as deductions for convenience only, without regard to whether technically they should be characterized as deductions or exclusions. See sec. 1.1382–1(a), Income Tax Regs.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue.

[3] Certain farmers' cooperatives are tax exempt under sec. 521, except as otherwise provided in subch. T.

At all times relevant to this case, petitioner was engaged in the business of marketing and storing grain, selling agricultural supplies, including feed, fertilizer, and other products, and providing storage facilities and services to its members and nonmembers. Petitioner served a geographic area extending approximately 20 miles north, south, and east, and approximately 35 miles west, of Kingfisher, Oklahoma.

### Petitioner's Membership and Operations

Under petitioner's bylaws, in effect during the year in issue, membership in the cooperative was open to any producer of agricultural products handled by or through petitioner, who resided, farmed, or owned land in any territory served by petitioner, who agreed to comply with petitioner's bylaws, and who purchased the par value of 1 share of petitioner's capital stock. Membership was subject to the approval of an applicant's written application by petitioner's board of directors. Generally, each member was entitled to one vote, irrespective of the number of shares held, subject to certain exceptions for jointly held stock and votes to change the authorized capital stock.

Petitioner's business activities were managed by its board of directors. The board was composed of five members who were elected to staggered 3-year terms by the members at annual membership meetings. Candidates for vacancies on the board were selected by an independent nominating committee that attempted to select active members who were committed to petitioner and the cooperative way of doing business. The committee made an effort to select nominees so as to insure geographic diversity on the board over the area serviced by petitioner. Petitioner's directors maintained frequent informal contacts with the members in their areas. The directors were actively involved in the computation of petitioner's patronage dividends and were aware of how regional patronage dividends entered into the computation.

Petitioner's membership grew considerably after its founding in 1934 with 48 original stockholders. Ordinarily, once a farmer became a member-patron of petitioner, he maintained his membership until he retired or died, at which time other family members often took over the farming operation and continued membership in petitioner.

The amount of patronage for each member varied each year depending on crop conditions and price considerations. Petitioner's membership, however, remained relatively stable. Petitioner's membership turnover for fiscal years 1979, 1980, and 1981 was as follows:

|                          | FY 1979 | FY 1980 | FY 1981 |
|--------------------------|---------|---------|---------|
| Membership on Apr. 1     | 1,125   | 1,131   | 1,142   |
| Add: New members         | 59      | 49      | 54      |
| Less: Terminated members | 53      | 38      | 39      |
| Membership on Mar. 31    | 1,131   | 1,142   | 1,157   |

The percentages of members terminating their membership for the fiscal years 1979, 1980, and 1981 were 4.7 percent, 3.4 percent, and 3.4 percent, respectively. Most of the terminations were the result of the retirement or death of a member.

At all relevant times, petitioner was a member of four cooperatives from which it received services, financing, and farm supplies, and through which it marketed products and rendered services. Among these cooperatives were Union Equity Cooperative Exchange (Union Equity), a regional grain marketing cooperative of Enid, Oklahoma, to which petitioner sold grain purchased from members and nonmembers for sale and storage, and Farmland Industries, Inc. (Farmland), a regional supply cooperative of Kansas City, Missouri, from which petitioner acquired agricultural supplies for sale to its members and nonmembers. As a local cooperative, petitioner received patronage dividends from the regional cooperatives of which it was a member, including Union Equity and Farmland.

Petitioner, Union Equity, and Farmland utilized the basic cooperative principle of patronage refunds—i.e., the annual net income of the cooperative from business done with or for its member-patrons was allocated to member-patrons on the basis of the relative amount of patronage during the year. This income was then distributed as patronage dividends within 8½ months of the cooperative's yearend.

Petitioner's bylaws required apportionment of petitioner's net earnings at least annually by the directors, subject to revision by the members at an annual or special meeting. Petitioner held annual meetings of its membership, attended by approximately 545, 600, and 470 persons in 1979, 1980, and

1981, respectively. During these meetings, members were apprised of the business of petitioner, nominations and elections of directors were conducted, and, after an opportunity for discussion by petitioner's members, the apportionment of earnings recommended by the directors was ratified.

Petitioner's members were informed on a regular basis of the cooperative's business and the allocation of all components of the patronage dividends, including those received from Union Equity and Farmland. This information was disseminated by petitioner in the annual report, monthly newsletters, yearly patronage statements accompanying dividend payments, and on an informal basis through discussions among the members, directors, and general manager. Petitioner's members thus had notice and presumptively were aware for many years that patronage dividends received from Union Equity and Farmland were included in petitioner's income in the year of receipt and assigned to petitioner's pertinent allocation units. They presumptively were aware that those patronage dividends were a part of the net earnings in each of petitioner's allocation units that were distributed to petitioner's members in proportion to the business those members did with petitioner in each of its allocation units in the year the particular patronage dividend was received.

### Petitioner's Business Operations and Transactions With Its Members

Petitioner's members had substantial flexibility in selling their wheat to, or storing it with, petitioner upon harvest. Upon delivery for sale or storage, petitioner commingled the wheat with its wheat inventory then on hand. Members sold their crops to petitioner at various times depending on market conditions and available Government programs.

As required under Federal warehouse licensing requirements, petitioner maintained records on a daily basis showing beginning inventory, wheat purchases and sales, and closing wheat inventory. Petitioner maintained a daily grain position of grain stored with it, either in open storage or in other warehouses for which petitioner received a receipt, and of grain purchased from its members.

Petitioner's grain purchases exceeded its sales. Petitioner's sales to Union Equity occurred at various times during the

year depending on the size of petitioner's owned inventory and market conditions. Because of the fungible nature of wheat, petitioner could not identify particular sales to Union Equity with particular purchases from members. Neither the source of grain shipped by petitioner to Union Equity nor the year such grain was harvested and delivered to petitioner could be identified.

Petitioner also sold member wheat from time to time to corporations that were not organized as cooperatives. During the year in issue, petitioner sold 2,182 bushels of wheat to private entities that were not organized as cooperatives. In April and May 1980, petitioner sold 70,000 bushels of wheat to the Commodity Credit Corp. These sales did not generate any patronage dividends from the purchasers nor from Union Equity. Petitioner could not identify which purchases from its members generated these sales.

Petitioner purchased various items of equipment and supplies used by its patrons in their farming operations. These goods were purchased primarily from Farmland and held in inventory by petitioner for sale to its members. Petitioner frequently made purchases from Farmland in anticipation of member needs, often in the off-season in order to secure a price advantage. Thus, items were held in inventory by petitioner for varying lengths of time depending on its inventory and member demand for a particular item. Many items were held in inventory beyond the close of the fiscal year of the entity from which petitioner purchased the item and/or beyond the close of the fiscal year in which petitioner acquired the item. The sale of a particular item could not be identified with the prior purchase of that item by petitioner. Although petitioner conducted an annual inventory of its merchandise, it could not determine the period for which a particular item had been held in inventory.

Because of the seasonal nature of farming, petitioner's month-to-month profitability varied significantly during its fiscal year. Some periods of time during the year were associated with losses, while others were associated with higher than average profits. Petitioner's sales, cost of sales, inventories, gross margins, and net earnings in each of its allocation units varied substantially from month to month during its 1979, 1980, and 1981 fiscal years. Thus, petitioner's

net earnings available for payment of patronage dividends were not generated evenly over its fiscal year.

Nonmargin items such as shrinkage, interest expenses, salaries, overhead, taxes, and depreciation affected the amount of petitioner's net earnings available for distribution to its members. These items were not identified with any particular transactions in computing petitioner's patronage dividend.

## Union Equity's Business Operations and Transactions With Petitioner

At all relevant times, petitioner's transactions with Union Equity related solely to sales and storage of wheat. Union Equity purchased wheat from members in quantities ranging from 600 to 3,300 bushels. Grain purchased from petitioner and others was commingled by Union Equity in its inventory of owned grain from which Union Equity thereafter made its sales. Union Equity maintained a grain inventory that was valued at market (realizable value adjusted for freight) determined from open sale contracts or Houston bid price, adjusted for net gains or losses on open commodity contracts. Union Equity ordinarily sold its grain in vessel quantities ranging from 1 million to 2.5 million bushels. Because of the fungible nature and the commingling of grain, sales could not be identified with particular prior purchases.

Union Equity's sales, cost of sales, inventories, gross margins, and net earnings in each of its allocation units varied substantially from month to month during the years ended December 31, 1979, 1980, and 1981. During calendar year 1979, Union Equity's grain inventory ranged from $18 million on June 1, to $130 million on November 1; monthly sales ranged from $43 million in May to $113 million in December. These variations were due primarily to weather and market conditions. The grain market price often fluctuated significantly between the purchase of a specific quantity of grain and the sale of a similar quantity by Union Equity. Thus individual transactions were not equally profitable.

Union Equity's net earnings available for payment of patronage dividends to petitioner and other local cooperatives were not generated evenly over 1979. Some periods during the

year were associated with losses, while others were associated with higher than average profits.

Nonmargin items such as overhead expenses, interest expenses, hedging income and loss, patronage dividends from other cooperatives, and depreciation affected the amount of Union Equity's net earnings available for distribution to petitioner and other members. These items were not identified with any particular grain transaction nor with particular months.

Union Equity classified each transaction by patron account number and commodity on a daily basis. This information was used by Union Equity at yearend to allocate net earnings in each allocation unit between patrons and nonpatrons, and as the basis upon which the portion of member net earnings in each allocation unit was allocated to business done with or for patrons according to Union Equity's bylaws.

In computing its net earnings for each of its allocation units, Union Equity based its calculations on averages. It did not look to specific transactions, nor was it possible to determine to which grain purchases the net earnings in a particular year or month were attributable. Union Equity determined its total patronage dividend paid on May 31, 1980, by reference to the net earnings reflected in its financial records for the year ended December 31, 1979. Union Equity allocated the total patronage dividends to the patrons of its grain marketing and grain storage allocation units according to the quantity of wheat sold to Union Equity and the amount of storage fees incurred with Union Equity by each patron in the year ended December 31, 1979.

### Farmland's Business Operations and Transactions With Petitioner

At all relevant times, Farmland purchased, produced, and processed various farm supplies, added them to bulk inventories and made sales from inventories to its members. Because of the fungible nature of its supplies, sales could not be identified with particular purchases or production. Farmland maintained inventories valued on a lower of cost or market basis for each of its product lines.

Farmland's sales, cost of sales, inventories, gross margins, and net earnings in each of its allocation units varied

substantially from month to month during the years ended August 31, 1979, 1980, and 1981. Due to the seasonal nature of farming, Farmland's supply inventory levels fluctuated. Farmland's sales of a single product in an allocation unit were not all equally profitable due to the impact of market demand, transportation costs, and weather conditions.

Farmland's net earnings available for payment of patronage dividends to petitioner and other local cooperatives were not generated evenly over Farmland's fiscal year ended August 31, 1980. Some periods during the years ended August 31, 1979, 1980, and 1981, were associated with losses, while others were associated with higher-than-average profits. During fiscal year 1980, Farmland's monthly net earnings ranged from approximately $1 million in December to approximately $51.6 million in August.

Nonmargin items such as warehousing, general overhead, and corporate expenses affected the amount of Farmland's net earnings available for distribution to petitioner and other members. These items were not identified with particular transactions between Farmland and its members.

Farmland classified each transaction by patron account number and commodity on a daily basis. This information was used by Farmland at yearend to allocate net earnings in each allocation unit between patrons and nonpatrons, and as the basis upon which the portion of member net earnings in each allocation unit was allocated to business done with or for patrons according to Farmland's bylaws.

Farmland made no attempt to determine whether particular transactions were profitable. Rather, it determined annually whether there were earnings in each of its allocation units. In computing net earnings for each of its allocation units, Farmland did not look to specific transactions, nor was it possible to determine to which sales the net earnings in a particular period were attributable. To the extent a unit had net earnings, they were distributed ratably to the Farmland members who patronized that unit.

Farmland determined its total patronage dividend paid on December 31, 1980, by reference to the net earnings reflected in its financial records for the year ended August 31, 1980. Farmland allocated the total patronage dividends to the patrons of each of its allocation units according to the dollar

amount of products of that unit purchased from Farmland by each patron during the fiscal year.

## Computation of Petitioner's Patronage Dividends

For its cooperative accounting purposes since at least fiscal year 1973, petitioner allocated its annual patronage dividend among seven allocation units: wheat; other grain; grain storage; feed, seed, and farm supplies; service income; anhydrous ammonia fertilizer; and other fertilizer. Petitioner followed this allocation method with respect to its patronage dividend for fiscal year 1981.

Petitioner's directors made an annual allocation of petitioner's net earnings from its seven allocation units upon recommendation of its auditors and general manager. Pursuant to petitioner's bylaws, net earnings accrued on business transacted with or for members, in excess of reserve fund and tax requirements, were required to be apportioned among all members on the basis of patronage and distributed in cash, merchandise, credits on capital stock, member equity credits, special reserves, certificates of equity, or any form of non-interest-bearing instrument without due date.

During fiscal year 1981, petitioner received patronage dividends from cooperatives of which it was a member-patron as follows:

|  | Payor's FYE | Date paid | Amount received |
|---|---|---|---|
| Union Equity Cooperative, Inc ...... | 12/31/79 | 05/13/80 | $68,553.56 |
| Farmland Industries, Inc.............. | 08/31/80 | 12/31/80 | 131,425.43 |
| Wichita Bank for Cooperatives[4] .... | 12/31/79 | 03/23/81 | 18,690.47 |
| Pioneer Telephone Co............................................... |  |  | 0 |
| Total..................................................... |  |  | 218,669.46 |

The patronage dividend distribution received by petitioner from Union Equity in 1980 was allocated and distributed on the basis of business done by petitioner with Union Equity in Union Equity's year ended December 31, 1979. It included petitioner's share of patronage dividend distributions received

---

[4]The patronage dividend received by petitioner from the Wichita Bank for Cooperatives was accounted for as a reduction in interest expense otherwise reducing net earnings available for distribution.

by Union Equity in 1979 from other cooperatives of which Union Equity was a member. The patronage dividend distribution received by petitioner from Farmland in 1980 was allocated and distributed on the basis of business done by petitioner with Farmland during Farmland's fiscal year ended August 31, 1980. It included petitioner's share of patronage dividend distributions received by Farmland during its 1980 fiscal year from other cooperatives of which Farmland was a member.

In computing the amounts of its net earnings distributable to member-patrons on a patronage basis for its 1981 fiscal year, petitioner included in gross income the patronage distributions received from Union Equity and Farmland in 1980. Of the $68,553.56 patronage dividend received from Union Equity, $64,939.40 was attributable to wheat marketing and $3,614.16 was attributable to storage. Petitioner included $64,939.40 in its 1981 gross income in its wheat marketing allocation unit and $3,614.16 in its 1981 gross income in its storage allocation unit. After determining the percentage of 1981 fiscal year wheat purchases by hundredweight from members and nonmembers, petitioner allocated the portion of its 1981 fiscal year net earnings of its wheat marketing allocation unit relating to member business in proportion to the volume of wheat marketing business transacted with or for each of its members in fiscal year 1981. Petitioner allocated the portion of its 1981 fiscal year net earnings of its storage allocation unit relating to member business in proportion to the dollar value of the storage business transacted with or for each of its members in fiscal year 1981.

The $131,425.93 patronage dividend paid by Farmland was allocable to each of the Farmland allocation units of which petitioner was a member as follows:

| | |
|---|---|
| Fertilizer | $104,412.63 |
| Agricultural chemicals | 1,305.68 |
| Feed | 19,887.11 |
| Farm and home | 951.88 |
| Lube, oil, and grease | 487.54 |
| Tires, batteries, and accessories | 472.02 |
| Facilities and equipment | 837.02 |
| Local facilities | 3,072.05 |
| | 131,425.93 |

Farmland allocated the total patronage dividends to its patrons of each of its allocation units according to the dollar amount of products of that unit purchased from Farmland by each patron in Farmland's fiscal year ended August 31, 1980.

In determining its net earnings for fiscal year 1981, petitioner added the Farmland patronage dividend received during this period to its gross income in its ammonia fertilizer, other fertilizer, and feed, seed, and farm allocation units. After determining the portion of fiscal year 1981 sales in each allocation unit attributable to members and nonmembers, petitioner allocated the member portion of its fiscal year 1981 net earnings in each unit to its members in proportion to the dollar amount of sales to members during the fiscal year.

Petitioner had followed these allocation and distribution practices since at least fiscal year 1973.

During a meeting of petitioner's directors on March 17, 1981, a motion was made and carried, subject to approval of the members, for distribution of earnings for the 1981 fiscal year as follows:

> The surplus account be credited with an amount approximating 10% of the net earnings in keeping with the provisions of the by-laws.
>
> The remainder of the net earnings are to be distributed on the basis of patronage to all members and patrons who are eligible for membership, at least 25% in cash, and the remainder in capital stock and stock credits. All patronage amounts of 99¢ or less to be deleted; all patronage amounts from $1.00 through $3.99 to be paid 100% in cash; stockholders with birthdate of 12/31/1903 or before to receive 100% in cash and all others to receive 25% in cash and the remainder in stock and stock credits.

On April 22, 1981, the directors determined that 25 percent of the patronage dividend would be paid in cash, subject to approval of the members and the Wichita Bank for Cooperatives, and that anyone having attained his 76th birthday would be paid 100 percent in cash.

On May 1, 1981, the directors approved payment of a patronage dividend of $321,079.93 for the 1981 fiscal year according to the following schedule:

| | | Member volume | | Rate | | Patronage dividend |
|---|---|---|---|---|---|---|
| 1. | Wheat - cwt | 772,958.65 | @ | 13.3348 ¢ | cwt | $103,072.49 |
| 2. | Other grain - cwt | 7,495.00 | @ | 20.00 ¢ | cwt | 1,499.00 |
| 3. | Storage - $ | 243.349.61 | @ | 28.00 % | | 68,137.89 |

|    |                                   | Member volume |   | Rate  |   | Patronage dividend |
|----|-----------------------------------|---------------|---|-------|---|--------------------|
| 4. | Feed, seed and farm supplies - $  | 710,234.76    | @ | 4.21  | % | $29,900.88         |
| 5. | Service income - $                | 156,138.26    | @ | 25.00 | % | 39,034.57          |
| 6. | NH - 3 $                          | 115,891.45    | @ | 7.00  | % | 8,112.40           |
| 7. | Other fertilizer - $              | 950,969.28    | @ | 7.50  | % | 71,322.70          |
|    |                                   |               |   |       |   | 321,079.93         |

Delete all checks for 99¢ or less

| Cash patronage | Percent of cash |
|---|---|
| All checks from $1 through $3.99 | 100% |
| Stockholders with stock owned 3/31/81 | |
|     $10 through $99.99 | 25% |
|     $100 or more | 25% |
| Stockholders with birthdate of 12/31/1903 or before | 100% |

At petitioner's annual stockholders' meeting on May 16, 1981, the financial report was presented by the general manager and, after an opportunity for discussion by petitioner's members, the apportionment of earnings recommended by the directors was ratified.

Petitioner distributed its 1981 fiscal year member net earnings of $321,079.93 in cash and written notices of allocation to its patrons on and immediately after May 17, 1981. Petitioner allocated and distributed its 1981 patronage dividend in its wheat, other grain, and storage allocation units on the basis of quantity of business done with or for its patrons during the 1981 fiscal year. The patronage dividend was distributed within petitioner's anhydrous ammonia, other fertilizer, feed, seed, and farm supplies and service income allocation units on the basis of the value of business done with or for its patrons during the 1981 fiscal year. Petitioner provided its members with a patronage statement detailing the sources of their individual patronage dividend and a letter setting forth the basis upon which the patronage dividend was calculated. Petitioner claimed a patronage dividend deduction of $321,079.93 on its corporate income tax return for fiscal year 1981.

In his notice of deficiency, respondent disallowed $133,864.30 of petitioner's patronage dividend deduction by disallowing all of the amount attributable to the patronage dividend petitioner received from Union Equity and seven-

twelfths of the amount attributable to that received from Farmland. The disallowance was explained as follows:

It is determined that you incorrectly computed your patronage dividend deduction for the year by allocating to current year patrons the Regional Patronage Dividends received during the year. These Regional Patronage Dividends were earned on business done by prior year patrons.

OPINION

Generally, subchapter T permits cooperatives to deduct from gross income amounts paid to patrons as patronage dividends, and subjects the patrons to tax on these dividends to the extent they arise out of the patrons' business transactions with the cooperative. Secs. 1381 through 1388. Thus the foundation of subchapter T is a single level of tax. See *Riverfront Groves, Inc. v. Commissioner*, 60 T.C. 435, 440–441 (1973).

Although section 1382(a) requires a cooperative to treat patronage dividends as an item of gross income, a corresponding deduction from gross income is allowed under section 1382(b) to the extent that the patronage dividends are properly distributed within the terms of the statute.

The statutory standard for determining the deductibility of patronage dividends is set forth in section 1388(a). This section embodies the equitable allocation principle surrounding this controversy and defines "patronage dividend" as an amount paid to a patron:

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Section 1388(a) further provides that patronage dividends do not include any amount paid to a patron to the extent that the amount is out of earnings other than from business done with or for patrons, or is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

The concept of equitable allocation—that earnings must be allocated ratably to the particular patrons whose patronage

created the earnings from which the allocated dividend was made—was a judicially recognized requirement for the deductibility of patronage dividends prior to the enactment of subchapter T. *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. 894, 900 (1982); *Union Equity Cooperative Exchange v. Commissioner*, 58 T.C. 397, 403 (1972), affd. 481 F.2d 812 (10th Cir. 1973). Respondent contends that petitioner's method of allocating regional patronage dividends according to its patronage in the year of receipt violates this principle. Respondent argues that these patronage dividends were properly allocable to those patrons who contributed to the earning of the dividends. Asserting that the regional dividends were earned on business done by prior years' patrons, respondent reduced the patronage dividend deduction claimed by petitioner for the year in issue by advancing a simplistic formula which he claims will result in an equitable allocation: prorate the earnings to the months earned and allocate those prorated earnings ratably to the members of the allocation unit to which the prorated earnings are assigned. Under this formula, respondent determined that the entire patronage dividend received by petitioner from Union Equity and seven-twelfths of that received from Farmland were attributable to business done prior to April 1, 1980, and, therefore, were not properly allocable to petitioner's patrons in the year the dividends were received.

Petitioner contends that in view of the stability of its membership and the fact that the transactions between petitioner, its members, Union Equity, and Farmland span various accounting periods, the allocation method chosen by its democratically elected board of directors, ratified annually and employed consistently for many years, was equitable and reasonable. We agree with petitioner.

Section 1382(f) prescribes the treatment of earnings received after patronage occurred:

If any portion of the earnings from business done with or for patrons is includible in the organization's gross income for a taxable year after the taxable year during which the patronage occurred, then for purposes of applying * * * [section 1382(b)] the patronage shall, to the extent provided in regulations prescribed by the Secretary, be considered to have occurred

during the taxable year of the organization during which such earnings are includible in gross income.[5]

Despite the express language of section 1382(f) and the absence of a statutory requirement that patronage dividends in some specific circumstances must be allocated to prior years' patrons,[6] respondent maintains that the requirement of equitable allocation necessitates tracing to those patrons whose business generated the earning of the regional dividends.

In support of his theory, respondent relies on a variation of the same type of theoretical arguments he advanced in other cases involving vertical allocations, focusing on the characterization of a cooperative as a conduit or agent. See *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. 894 (1982); *Ford-Iroquois FS, Inc. v. Commissioner*, 74 T.C. 1213 (1980); *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. 729 (1977). Vertical allocation involves allocation among continuing patrons from year to year, whereas, horizontal allocation involves allocation between patrons and nonpatrons in the same year. See *Lamesa Cooperative Gin v. Commissioner, supra.*

In *Lamesa Cooperative Gin v. Commissioner, supra*, we considered respondent's equitable allocation argument in his attempt to allocate gain on the sale of equipment that had been leased over a 10-year period to members of an exempt cotton gin cooperative to its member-patrons in the years in which the recaptured depreciation was claimed. We concluded that the cooperative's allocation of the gain to its current year patrons was not inequitable under the circumstances. Rejecting respondent's equitable allocation argument, we stated:

the requirement of "equitable allocation" should not be seen as a strict accounting requirement but as only a general principle to prevent inequitable treatment to some patrons at the expense of others. As a principle of equity, the overall scheme of allocation should be examined, including the practicalities of making allocations, the democratic nature of cooperatives, and the extent of patronage to the cooperative by nonmembers who have no

---

[5]Sec. 1.1382–6, Income Tax Regs., provides that patronage will be deemed to have occurred in the year in which the income is includable in the cooperative's gross income.

[6]Cf. sec. 1.1382–3(c)(3), Income Tax Regs., which requires *nonpatronage-sourced* income realized by an *exempt* cooperative from the sale or exchange of capital assets held more than one taxable year to be paid "insofar as is practicable" to the persons who were patrons during the taxable years in which the assets were owned in proportion to the amount of business done by such patrons during such taxable years.

say over how patronage dividends are distributed. [*Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 903.]

We concluded that the concept of equitable allocation does not require that net margins be allocated precisely in proportion to the patronage that generated them, nor mandate a particular form of accounting. *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 902, 907.

Respondent's objections to petitioner's allocation method in this case are not unlike those we rejected in cases involving his past attempts to require tracing with respect to cooperatives' net operating loss deductions through the principle of "operation at cost." The concept of operation at cost means that a cooperative was organized for the purpose of rendering economic services, without gain to itself, to shareholders or to members who own and control it. *Ford-Iroquois FS, Inc. v. Commissioner*, 74 T.C. 1213, 1219 (1980); *United Grocers, Ltd. v. United States*, 186 F. Supp. 724, 733 (N.D. Cal. 1960), affd. 308 F.2d 634 (9th Cir. 1962). We initially rejected respondent's operation-at-cost argument in *Associated Milk Producers, Inc. v. Commissioner, supra*, where he argued that because of this principle, a cooperative by its very nature could not have a net operating loss for tax purposes. Respondent reasoned that in any year in which expenses exceed gross income, the loss must be recovered from the members who were patrons for that period—"i.e., the exact converse of a patronage dividend allocation when income exceeds expenses." We disagreed with respondent's reasoning and concluded that his position constituted "an unwarranted tinkering with the tax structure applicable to cooperatives." *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. at 735–736.

We subsequently rejected respondent's further refined position in *Ford-Iroquois FS, Inc. v. Commissioner, supra*, where he sought to deny the net operating loss carryforward only for terminated members, and not for all members as he had proposed in *Associated Milk Producers*. In *Ford-Iroquois FS, Inc.*, we examined the cooperative's bylaws and articles, its overlapping membership in its marketing and supply operations, the contacts between the managers and directors of the cooperative and its members, the actual allocations, and the apparent approval of the cooperative's allocation method by its members. We concluded that the cooperative's method of

allocation was practicable, nondiscriminatory, and equitable, and stated that "The allocation of losses among a cooperative's past, continuing, and future members is properly the concern of the membership and its board of directors." *Ford-Iroquois FS, Inc. v. Commissioner*, 74 T.C. at 1220–1222.

Focusing our inquiry on whether the allocation was inequitable in view of the board of directors' considerable discretion, we note that the board's weighing of the equities should be overturned by this Court only when the exercise of that discretion appears to have been unreasonable. *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 906.

Respondent recognizes that the Government should not ordinarily interfere with a cooperative's method of allocating earnings, but insists that there are limits beyond which a cooperative may not go without sacrificing operation on a cooperative basis. He acknowledges also that there may be various acceptable methods of allocation. See *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 910. Respondent insists, however, that petitioner's allocation method is "ipso facto discrimination" and does not comport with the provisions of subchapter T.

As we noted in *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 903, the cases that have found inequitable allocations have generally involved allocations between member and nonmember patrons. E.g., *Petaluma Co-operative Creamery v. Commissioner*, 52 T.C. 457 (1969); *Farmers Union Cooperative Co. v. Commissioner*, 90 F.2d 488 (8th Cir. 1937), affg. 33 B.T.A. 225 (1935). Focusing on the democratic nature of a cooperative, we emphasized that the greatest risk of inequitable allocation arises when a cooperative allocates net margins to members at the expense of nonmembers who have no voice in the election of management. *Lamesa Cooperative Gin v. Commissioner*, 78 T.C. at 903–904. In the case of a vertical allocation problem, however, the management has been directly elected by the members of the cooperative and "the key factor is that the identity of the patrons has remained stable enough so that there is no reason to assume that * * * [Lamesa's] management would be prone to take actions discriminatory against past patrons." 78 T.C. at 905.

Here, as in *Lamesa Cooperative Gin v. Commissioner, supra*, the controversy centers around petitioner's allocation of earn-

ings among continuing patrons from year to year, and thus, the key factor is the stability of petitioner's membership. The parties stipulated that petitioner's membership turnover was less than 5 percent during its 1979, 1980, and 1981 fiscal years. Moreover, most of the terminations in membership involved the death or retirement of a member whose membership was subsequently continued by another family member. Thus, it appears that substantially all of petitioner's patrons remained the same from year to year.

Respondent failed even to consider petitioner's overlapping membership. In view of the continuity in petitioner's membership, it is apparent that respondent's proposed adjustment incorrectly disallows amounts that would have been paid to the same patrons under either petitioner's or respondent's allocation method.

Respondent presented no evidence of objections to petitioner's allocation method, nor of any particular instances of discrimination. Petitioner's net earnings were apportioned annually by its directors as required under its bylaws. The directors employed various means of communication to apprise the members of petitioner's business and the allocation of patronage dividends, including newsletters, annual reports, and informal and formal meetings. Although the members were given the opportunity to discuss and object to the directors' allocation of earnings, the evidence establishes that the directors' recommendations were consistently ratified since at least 1979. Because of the stability in petitioner's membership and the total lack of evidence of discrimination against past patrons, we have no reason to suspect any discriminatory action on the part of petitioner's management with respect to its allocation of patronage dividends. To the contrary, it appears that petitioner's directors made a concerted effort to insure that all members were treated fairly.

Another factor to be considered is the practicality of making a particular type of allocation. *Lamesa Cooperative Gin v. Commissioner*. 78 T.C. at 906. Much of the evidence and testimony presented by petitioner relates to the seasonal nature of farming and its effect on transactions among petitioner, its members, Union Equity, and Farmland, including the computation and distribution of patronage dividends. Factors such as the effect of commingled and carryover

inventories, the timing of purchases and sales, unequal profitability among transactions, and sources of net earnings are extremely relevant to our inquiry as to whether petitioner's allocation method was equitable. In our view, these factors are indicative of the practical and conceptual problems underlying the period-tracing method advocated by respondent and the need for the seasoned judgment of petitioner's members and their elected board of directors in adopting an equitable allocation method. It is obvious that the net earnings from a particular period in a regional cooperative's business cycle do not necessarily relate to the local transactions during the identical time period.

The evidence also establishes that the transactions among petitioner, its members, Union Equity, and Farmland overlap the various accounting periods of each entity. The regional cooperatives in turn receive patronage dividends from upper-tier cooperatives of which they are members, each potentially with a different fiscal year. Respondent's method ignores the fact that a patron's transactions necessarily overlap annual accounting periods. The complex calculations that would be required to trace the earnings through the various levels and fiscal years in order to determine which patrons generated the earnings would necessitate tracing of individual transactions despite respondent's claim to the contrary. Such tracing would be costly and cumbersome and is not required by subchapter T, prior precedent, or principles of cooperative accounting.

Petitioner's witnesses, experienced in the cooperative farming business, testified that petitioner's allocation method was in accordance with generally accepted cooperative principles. Petitioner followed this method consistently, apparently without objection, for many years. Respondent has ignored the realities of the cooperative way of business and substituted a method of period-tracing that revolves around the fiscal year of the regional cooperative from which the patronage dividend was received. Respondent presented no evidence, however, to indicate that the regional dividends were in fact attributable to petitioner's patronage during such earlier periods, nor to demonstrate that his method would result in a more accurate and equitable allocation of regional dividends to the local transactions which generated such earnings than that of petitioner.

Considering the stability of petitioner's membership, the practicalities of the allocation, and the apparent approval of petitioner's allocation method by its members, we find petitioner's method to be fair and equitable and within the statutory framework of subchapter T.

*Decision will be entered for the petitioner.*